82,475-03

DECEMBER 15, 2015

HON. SHARON KELLER

CHIEF JUSTICE, COURT OF CRIMINAL APPEALS OF TEXAS

P.O. BOX 12308

CAPITOL STATION

AUSTIN, TX 78711

RECEIVED IN
COURT OF CRIMINAL APPEALS

DEC 21 2015

Abel Acosta, Clerk

RE: WRIT OF MANDAMUS   WR-82,475-03

YOUR HONOR,

I APOLOGIZE FOR THE PIECEMEAL SUBMISSIONS SUPPORTING THE WRIT OF MANDAMUS TO COMPEL THE THIRD COURT OF APPEALS TO DISQUALIFY THE TRIAL JUDGE.

TDCJ PERSONNEL J.D. SEIGLE, BRAD LIVINGSTON, AND OTHERS CONTINUE TO INTERFERE WITH MY CASES, REFUSING TO RETURN MY LEGAL WORK. THIS OBSTRUCTION AND ONGOING RETALIATION IS CAUSING UNREASONABLE DELAYS IN THIS CASE AND MY RELATED FEDERAL CASES.

IN ADDITION TO THE SUPPORTING DOCUMENTS PREVIOUSLY SUBMITTED TO THE COURT, I AM SENDING YOU THIS SIGNIFICANT INFORMATION SUPPORTING THE REASONABLE POSSIBILITY THE TRIAL JUDGE, KAREN SAGE, MAY HAVE BEEN BRIBED FOR HER DECISIONS.

NOT ONLY IS THERE THE FACT HER DECISIONS MAY HAVE INTERFERED WITH A FEDERAL BANKRUPTCY PROCEEDING, BUT THOSE DECISIONS, AS JONESTOWN MAYOR DEANS ARMSTRONG, WATERSCAPE PROPERTY

OWNER, RICK VANDERSLICE, MILTON ALLEN AND, PROPERTY CARE-TAKER, SON PAUL, AND OTHERS ARE CONTROVERSY, NOW CALL INTO QUESTION THE REASONABLE POSSIBILITY SAGE IS NOW CRIMINALLY CULPABLE, UNDER THE CONSPIRACY STATUTE 18USC 24, IN MULTIPLE FEDERAL CRIMES, WHICH INCLUDE, BUT ARE NOT LIMITED TO:

1. ATTEMPT TO COMMIT MURDER OR MANSLAUGHTER UNDER 18USC1113. THIS IS SUPPORTED BY THE JONESTOWN POLICE REPORT, PAGE 4, ATTACHED. SINCE THAT REPORT WAS FILED, THERE ARE EXPERT WITNESSES FROM HARLEY DAVIDSON WHO WILL TESTIFY IN THIS MATTER THAT HAVE BEEN IDENTIFIED.

2. DESTRUCTION OF AN ENERGY FACILITY, UNDER 18USC 1366. THE WIND ENERGY SYSTEMS THAT WERE CONNECTED, IN JONESTOWN AND TAYLOR, WERE CONNECTED TO THE GRID AND DESIGNED TO PRODUCE POWER FOR BOTH A FACILITY AND THE GRID. THE DESTRUCTION WAS REPORTED TO BOTH THE JONESTOWN P.D. (SEE ATTACHED REPORT) AND THE DOE THROUGH SECO IN THE SECO MONTHLY REPORTS. (SEE PAGE 8).

CM ENERGIES ENTERED INTO AN ECONOMIC DEVELOPMENT GRANT WITH THE CITY OF TAYLOR ON MARCH 23, 2009, SEVERAL MONTHS BEFORE THE ARRA STIMULUS PROGRAM WAS FORMALLY AN-NOUNCED. THIS WAS TO OPEN A MANUFACTURING-RESEARCH AND DEVELOPMENT FACILITY. ANY IN-TELLIGENT PERSON WOULD KNOW THAT FACILITY WOULD BE CONDUCTING ONGOING RESEARCH AND DEVELOP-

2.

MENT. CM ENERGIES WAS ACTUALLY WORKING ON AN INTERNATIONAL PROJECT FOR PANAMA AT THE TIME. SEE COURT RECORDS. PAGE 11, ATTACHED IS A LETTER FROM THE TAYLOR EDC ACKNOWLEDGING CM ENERGIES FULFILLED ITS OBLIGATION. PAGE 12 IS A PHOTO OF THE R&D UNIT ATTACHED/CONNECTED TO THE GRID, MAKING THIS AN ENERGY FACILITY.

R&D FOR MILITARY AND NATIONAL DISASTERS WAS ONGOING. ALSO, FOR ADAPTATION TO GO TO MEXICO AND THIRD WORLD COUNTRIES WHERE THE POWER AND CONNECTION SYSTEMS ARE DIFFERENT. SEE HOWARD REED AFFIDAVIT PAGES 86-88.

3. DESTRUCTION OF NATIONAL DEFENSE MATERIAL UNDER 18 USC 2155; DESTRUCTION OF A NATIONAL DEFENSE UTILITY UNDER 18 USC 2155; DESTRUCTION OF WAR MATERIAL UNDER 18 USC 2153; DESTRUCTION OF A WAR UTILITY UNDER 18 USC 2153; SABOTAGE IN VIOLATION OF 18 USC 2154 AND 2155. DEFINITIONS AND STATUTES ARE REPRINTED ON THE ATTACHED PAGES 89-91.

CM ENERGIES WAS WORKING WITH THE CITY OF TAYLOR AND THE FAA TO PROVIDE POWER TO THE TAYLOR AIRPORT, ACROSS THE STREET FROM THE R&D FACILITY ON CARLOS PARKER BLVD. THE US. ARMY REFUELS HELICOPTERS AND SMALL CRAFT AT THAT AIRPORT. IN THE EVENT OF A NATIONAL EMERGENCY, DIRECT POWER FROM THE WIND ENERGY SYSTEM COULD BE RUN ACROSS THE STREET TO THE

3

AIRPORT. ADDITIONALLY, AS EARLY AS NOVEMBER, 2010, CM ENERGIES BEGAN A RELATIONSHIP WITH A CERTIFIED DOD SUBCONTRACTOR. THIS INCLUDED ADAPTING THE SYSTEMS TO BE MOBILE AND USED IN A WARTIME ENVIRONMENT. SEE PAGES 13-77.

A SIGNIFICANT FACTOR IN THESE CRIMES IS FOUND IN THE DEFINITIONS, WHICH READS IN PART, " INTENDED FOR," "ADAPTED TO," OR "SUITABLE FOR THE USE OF"... AND, "BEING PRODUCED, MANUFACTURED, REPAIRED, STORED..." AND INCLUDES "ANY... BUILDING, STRUCTURE, ...MACHINE, MECHANICAL CONTRIVANCE..." ALL OF WHICH APPLIES TO CM ENERGIES.

4. INTERFERENCE WITH INTERNATIONAL COMMERCE UNDER 18 USC 1951, AND INTERFERENCE WITH INTERSTATE COMMERCE ALSO UNDER 18 USC 1951. NOT ONLY WAS CM ENERGIES PREPARING TO DO BUSINESS IN MEXICO AND WITH THE DOD, BUT BUSINESS RELATIONSHIPS WERE DEVELOPED AND IMPLEMENTED TO CONDUCT BUSINESS IN NEW MEXICO, OKLAHOMA, LOUISIANA, COLORADO, CALIFORNIA, BANGLADESH, THE CARRIBBEAN, PANAMA AND OTHER COUNTRIES.

5. TAMPERING WITH EVIDENCE UNDER 18 USC 1519. THE CITY OF JONESTOWN WAS THE PRIMARY LEAD IN THE CRIMINAL INVESTIGATION OF THE DESTRUCTION OF THREE SYSTEMS. A FORMAL CRIMINAL COMPLAINT WAS MADE ON JUNE 22, 2011 (SEE ATTACHED). THE INSTANT CASE IS A PART OF THIS. THE CITY AND THE TRAVIS COUNTY DA KNEW THOSE SYSTEMS, INCLUDING

4

THE SYSTEM IN TAYLOR, WAS NOT ONLY EVIDENCE, BUT EXONERATING EVIDENCE. I'M BEING ACCUSED OF "DECEIVING" PEOPLE AND CREATING A SYSTEM THAT DID NOT WORK. HOWARD REED WITNESSED IT WORKING ON A SMALLER SCALE AT UT DURING THE ACTUAL R+D OF THE SYSTEM, AND WITNESSED IT WORK IN TAYLOR, ALONG WITH A RESPECTED ELECTRICAL ENGINEER FROM MEXICO (SEE HOWARD REED AFFIDAVIT PAGES 85-88 ATTACHED) AND STEVE WINTON, A LICENSED P.E. ALSO WITNESSED POWER BEING GENERATED. THE MALICIOUS DESTRUCTION OF MY SYSTEMS, MONTHS BEFORE TRIAL ELIMINATED ANY WAY TO PROVE THERE WAS NO DECEPTION. NOT ONLY IS TAMPERING WITH EVIDENCE A STATE FELONY AND PROSECUTORS ARE NOT EXEMPT IT'S A FEDERAL CRIME THEY ARE NOT EXEMPT FROM EITHER. THE JONESTOWN CITY COUNCIL MINUTES MAKE IT CLEAR, THE MAYOR, COUNCILMEN, MILTON AND PAUL ALLEN AND OTHERS WERE ALL ACTIVELY ENGAGED IN THE DESTRUCTION. IT'S BEEN ESTABLISHED PAUL ALLEN MAY HAVE CRIMINAL CULPABILITY AS HE WAS THE CARETAKER, AND PRESENT ON THE PROPERTY ON THE NIGHTS THE VANDALISMS OCCURED. THE PROPERTY WAS UNDER FEDERAL BANKRUPTCY PROTECTION.

6. TAMPERING WITH A WITNESS. UNDER 18 USC 1512.
THE SABOTAGE WAS REPORTED TO SECO AND DOE IN MONTHLY REPORTS. (SEE PAGE 8 ATTACHED). I REPORTED THE CRIME TO THE JONESTOWN PD ON JUNE 22, 2011, FOUR MONTHS BEFORE I WAS ARRESTED. PRIOR TO THAT, I

CAUGHT, AND REPORTED, TRAVIS COUNTY SHERIFF'S DEPUTY TOBY MILLER, FALSIFYING HIS FEDERAL GRANT TIME SHEETS. IT WAS MADE CLEAR IN COURT, NOT ONLY DID HE SEND ME AN EMAIL WISHING MIS HARM, BUT AS SOON AS HE FOUND OUT HE WAS UNDER INVESTIGATION, WHICH INCLUDES BEING THE PRIMARY SUSPECT ON ATTEMPTED MURDER, HE BEGAN OPENLY SEEKING RETALIATION.

2. OBSTRUCTION OF CRIMINAL INVESTIGATION OF ESPIONAGE UNDER 18USC 793, 794 and 795. TOBY MILLER AND SHELBY THOMAS CONVIENIENTLY FOUND NUMEROUS FLASH BANGS AT MY HOUSE FOUR DAYS AFTER I WAS ARRESTED AND MY HOUSE AND PROPERTY (WHERE THEY WERE FOUND) SEARCHED, AND WHILE I WAS STILL IN JAIL. THOMAS' PARENTS ARE VERY CLOSE TO THE MAYOR, DEANE ARMSTRONG AND THERE IS A NEXUS CONNECTION TO RICK VANDERSLICE. SHELBY THOMAS IS ALSO A SUSPECT IN THE SABOTAGE OF THE SYSTEMS AND MORE. THOMAS' PARENTS ARE POLITICALLY INFLUENTIAL IN THE TRAVIS COUNTY DEMOCRATIC PARTY.

ARMSTRONG, ALLEN, VANDERSLICE AND OTHERS ALL FACING CRIMINAL CHARGES, HAVE/HAD MOTIVE, MEANS, AND OPPORTUNITY TO INFLUENCE SAGE, DIRECTLY OR INDIRECTLY, FOR HER DECISIONS IN THIS CASE.

THERE IS NO QUESTION REGARDING THE CRIMINAL CULPABILITY OF THESE PEOPLE, HOLLY TAYLOR, SUSAN OSWALT AND GREG COX. AS THE FBI HAS OPENED AN INVESTIGATION INTO THIS CASE AND I AM AGGRESSIVELY PURSUING U.S. SENATE AND CONGRESSIONAL INVESTIGATIONS INTO THIS

6

CASE AND THE COVER-UP OF AN INCIDENT OVER A RUSSIAN SPY IN HOUSTON, DIRECTLY RELATED TO THE FLASH BANG FOUND AT MY HOUSE, AND THE INTENTIONAL WITHHOLDING OF EXONERATING EVIDENCE, I WILL BE HAULING EVERY PERSON INVOLVED IN THIS STATE CASE INTO FEDERAL CRIMINAL COURT, SENATE, AND CONGRESSIONAL HEARINGS JUST AS I DID HOLLY TAYLOR. AS THERE WILL BE NO IMMUNITY FROM TESTIMONY, I WILL CONTINUE TO PROVIDE SIGNIFICANT INFORMATION TO SUBSTANTIATE MY CLAIM THERE IS A REASONABLE POSSIBILITY KAREN SAGE WAS BRIBED FOR HER DECISIONS IN THIS CASE AND THAT OF MARY JO WOODALL, FOR VOTES AND CONTRIBUTIONS IN HER RE-ELECTION CAMPAIGN.

THE APPEARANCE OF IMPROPRIETY IS OVERWHELMING! IF THERE IS ANY INTEGRITY LEFT IN THE JUDICIARY, AS THERE CLEARLY IS NONE WITH DEPUTY MILLER OR THE PROSECUTOR AND POSSIBLY THE TRIAL JUDGE, SUBSTANTIAL JUSTICE DEMANDS THE DISQUALIFICATION OF THE TRIAL JUDGE, AND THIS CASE, AND THAT OF MARY JO WOODALL, BE IMMEDIATELY VACATED AND ALL DECISIONS, RULINGS AND OPINIONS BE VOIDED.

ONLY AN INDEPENDANT INVESTIGATION BY AN INDEPENDANT LAW ENFORCEMENT AGENCY, SUBMITTING THEIR FINDINGS TO AN UNBIASED AND INDEPENDANT JURY, CAN DETERMINE THE CRIMINAL CULPABILITY TO THE AFOREMENTIONED OFFENSES, IN ADDITION TO THE BRIBERY ALLEGATIONS. THIS INFORMATION IS BEING FORWARDED TO THE FBI TO AID IN THEIR INVESTIGATION.

7

AS MY SUBSTANTIVE RIGHTS HAVE BEEN GROTESQUELY VIOLATED AND MY LIBERTY UNCONSTITUTIONALLY TAKEN FROM ME, I URGE YOU TO COMPEL THE THIRD COURT OF APPEALS TO ACT ON MY MOTION TO DISQUALIFY THE TRIAL JUDGE, OR SUA SPONTE, BASED ON THE INFORMATION PROVIDED AND ON THE RECORD, DISMISS AND VACATE THESE CASES.

RESPECTFULLY SUBMITTED,

CHARLES A. MALOUFF JR. PRO SE
1918540
PACK UNIT TC 2-91
2400 WALLACE PACK RD
NAVASOTA, TX 77868

# JONESTOWN
# POLICE DEPARTMENT

18304 NORTH PARK DR
JONESTOWN, TEXAS78645

# Calls For Service
# Detail Page

| | |
|---|---|
| Print Date : **07/22/2011** | Call # **11-014356** |

| Date : **06/22/2011** | Day : **Wednesday** | Time : **09:15:00** | Dispatcher ID : **CHIEF** | Agency : **JPD** |
|---|---|---|---|---|

| Beat : **7** | Sector : **SUTH** | District : **CL** | Case # **11-014356** |
|---|---|---|---|

Address : **7748       LIVE OAK                        AV**

Location : **7748 LIVE OAK AV**

City : **JONESTOWN**                                    County : **TRAVIS**

## REPORTING PARTY INFORMATION

Name : **MALOUFF, CHARLES  12/27/1957**

Location : **18649 FM 1431 STE. 16**

Phone : **512   267-3243**                             Requests Contact : **N**

## RESPONSE INFORMATION

| 1st Unit : **Stetar** | 2nd Unit : **Postell** | |
|---|---|---|
| Officer ID : **2134 Chief John Stetar** | Officer ID : | Total Consumed Minutes of all associated Units : |
| Dispatch Time : **06/22/2011 09:15:00** | Dispatch Time : **/ /   : :** | **76** |
| Enroute Time : **06/22/2011 09:15:00** | Enroute Time : **/ /   : :** | |
| Arrive Time : **06/22/2011 09:15:00** | Arrive Time : **/ /   : :** | |
| Clear Time : **06/22/2011 10:30:00** | Clear Time : **/ /   : :** | Dispatch ID :   **CHIEF** |

## CALL DETAILS

Call Type : **1400        Criminal Mischief**                              Priority :   **0**

Description :

Damage to three of the wind generators used as part of the wind energy program being run through the city.

Disposition : **PND        Pending**                                      EMD Code:

Comments : **One of the generators was broken at the connective collar and some of the blades were broken as well.  The other two genrators had broken blades. See full report.**

)

# JONESTOWN
# POLICE DEPARTMENT

| Page | 1 | Case No. | 11-014356 |
|------|---|----------|-----------|

| Beat | Rpt Dist | Type: | | Seq: |
|------|----------|-------|---|------|
| 7 | CL | Offense | | 1 |

**Crime / Incident (Primary, Secondary, Tertiary)**
**28.03 PC Criminal Mischief**

| Attempt | Occurred | Date | Time | Day |
|---------|----------|------|------|-----|
| ☐ | On or From | 06/17/2011 | 12:00 | Fri |
| ☐ | To | 06/22/2011 | 09:00 | Wed |
| ☐ | Reported | 06/22/2011 | 09:15 | Wed |

**Location of Incident** 7748 LIVE OAK AV, JONESTOWN, TX

**Cross Street** 7748 LIVE OAK AV

**County** TRAVIS

Dispo   "V" = Victim   "RP" = Reporting Party   "W" = Witness   "S" = Suspect   "O" = Other

| Dispo | Last, First, Middle (Firm if Business) | Race | Sex | Age | HT | WT | Hair | Eyes | Home Phone |
|-------|----------------------------------------|------|-----|-----|----|----|------|------|------------|
| RP | MALOUFF, CHARLES | W | M | 53 | 0 | 0 | | | (512) 796-7000 |
| | Address P.O. BOX 118 | DOB 12/27/1957 | | DL Number | | | | State | Work Phone (512) |
| | City, State, Zip Code CEDAR PARK  TX  78645- | SSN | | Local ID # | State # | FBI # | | | Cell Phone 0 |
| | Last, First, Middle (Firm if Business) | Race | Sex | Age | HT | WT | Hair | Eyes | Home Phone |
| | Address | DOB | | DL Number | | | | State | Work Phone |
| | City, State, Zip Code | SSN | | Local ID # | State # | FBI # | | | Cell Phone |
| | Last, First, Middle (Firm if Business) | Race | Sex | Age | HT | WT | Hair | Eyes | Home Phone |
| | Address | DOB | | DL Number | | | | State | Work Phone |
| | City, State, Zip Code | SSN | | Local ID # | State # | FBI # | | | Cell Phone |
| | Last, First, Middle (Firm if Business) | Race | Sex | Age | HT | WT | Hair | Eyes | Home Phone |
| | Address | DOB | | DL Number | | | | State | Work Phone |
| | City, State, Zip Code | SSN | | Local ID # | State # | FBI # | | | Cell Phone |

**Synopsis:** Documented.  See complete report.

## SOLVABILITY

| | |
|--|--|
| Was there a witness to the crime? | N |
| Was a suspect arrested? | N |
| Is a suspect named? | N |
| Can suspect be located? | N |
| Can suspect be described? | N |
| Can suspect be identified? | N |
| Is stolen property identifiable? | N |
| Is there an unusual M.O.? | Y |
| Is significant physical evidence present? | N |
| Is this a major injury/sex crime? | N |
| Are there unique circumstances? | Y |
| Is there a good possibility of solution? | N |

| Continuation Attached : | ☐ | Property List Attached : | ☒ | Property Damage $ : | $94,000.00 |
|-------------------------|---|--------------------------|---|---------------------|------------|
| UCR : 14 | | Press Release : | ☐ | Domestic Violence Case : | ☐ |
| Gang Related : N | | Hate Crime : | ☐ | Victim Senior Citizen : | ☐ |
| Pursuit : ☐ | | Force Used : | ☐ | Child Abuse : | ☐ |
| Solvability Points 70 | | County Code : TRAVIS | | Disposition : OPEN | |
| Agency ORI # TX2272200 | | | | Connecting Case # | |
| | | | | CAD/CFS Event # 11-014356 | |

Assigned To : _____    Date : /  /

| Officer ID: Chief John Stetar | 2134 | Reviewed By : | Approved : | Date : /  / |
|-------------------------------|------|---------------|------------|-------------|

# JONESTOWN
# POLICE DEPARTMENT

| Page | | Case No. | | |
|---|---|---|---|---|
| | **2** | **11-014356** | | |
| | | Type: *Offense* | | Seq: **1** |

**Crime / Incident (Primary)**
**28.03 PC Criminal Mischief**

Attempt ☐

## Property Report

| Item # | Tag # | Article | Brand | Model | Serial No. (or Drug Type) | OAN | UCR |
|---|---|---|---|---|---|---|---|
| **1** | | **WIND** | | | | | **K** |

| Description | | | |
|---|---|---|---|
| **50' WIND TURBINE** | ☐ Stolen Value **0** ☐ Recovered Value **0** | ☐ Evidence Value **0** ☐ Safekeeping Value **0** | |
| Location Seized | | ☒ Damaged Value **54000** | |
| Owner , | Owner Address **JONESTOWN TX 78645-** | | |

| Item # | Tag # | Article | Brand | Model | Serial No. (or Drug Type) | OAN | UCR |
|---|---|---|---|---|---|---|---|
| **2** | | **WIND** | | | | | **K** |

| Description | | | |
|---|---|---|---|
| **WIND TURBINE (BROKEN BLADES)** | ☐ Stolen Value **0** ☐ Recovered Value **0** | ☐ Evidence Value **0** ☐ Safekeeping Value **0** | |
| Location Seized | | ☒ Damaged Value **20000** | |
| Owner , | Owner Address **JONESTOWN TX 78645-** | | |

| Item # | Tag # | Article | Brand | Model | Serial No. (or Drug Type) | OAN | UCR |
|---|---|---|---|---|---|---|---|
| **3** | | **WIND** | | | | | **K** |

| Description | | | |
|---|---|---|---|
| **WIND TURBINE (HORIZONTAL CRACKS ON SOME** | ☐ Stolen Value **0** ☐ Recovered Value **0** | ☐ Evidence Value **0** ☐ Safekeeping Value **0** | |
| Location Seized | | ☒ Damaged Value **20000** | |
| Owner , | Owner Address **JONESTOWN TX 78645-** | | |

| Item # | Tag # | Article | Brand | Model | Serial No. (or Drug Type) | OAN | UCR |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

| Description | | | |
|---|---|---|---|
| | ☐ Stolen Value ☐ Recovered Value | ☐ Evidence Value ☐ Safekeeping Value | |
| Location Seized | | ☐ Damaged Value | |
| Owner | Owner Address | | |

| Item # | Tag # | Article | Brand | Model | Serial No. (or Drug Type) | OAN | UCR |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

| Description | | | |
|---|---|---|---|
| | ☐ Stolen Value ☐ Recovered Value | ☐ Evidence Value ☐ Safekeeping Value | |
| Location Seized | | ☐ Damaged Value | |
| Owner | Owner Address | | |

| Item # | Tag # | Article | Brand | Model | Serial No. (or Drug Type) | OAN | UCR |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

| Description | | | |
|---|---|---|---|
| | ☐ Stolen Value ☐ Recovered Value | ☐ Evidence Value ☐ Safekeeping Value | |
| Location Seized | | ☐ Damaged Value | |
| Owner | Owner Address | | |

| Officer ID: **Chief John Stetar** | **2134** | Reviewed By: | Approved: | Date: . / / |
|---|---|---|---|---|

3

| JONESTOWN | | Page | 3 | Case No. **11-014356** | |
|---|---|---|---|---|---|
| **POLICE DEPARTMENT** | | | | Type: *Offense* | Seq: *1* |
| Crime / Incident (Primary)<br>28.03 PC Criminal Mischief | | Attempt ☐ | | **Narrative Report** | |

On the morning of June 22, 2011 I met with Charles Malouff the Director if the wind energy program that the City of Jonestown is operating under a Federal Grant and in conjunction with CM Energies. Mr. Malouff stated that there had been a number of incidents over the past 45 days that have led him to believe that someone may be trying to sabotage the wind energy project.

Mr. Malouff explained that about a month or so ago one of the wind turbines located on the Waterscape Property (Live Oak St.) was found to have been tampered with. The way the turbines are designed they will only turn in one direction. They have been well designed and tested in coordination with the University of Texas and they have been wind tunnel tested. It is not physically possible for the wind turbine to spin backwards as it would violate the laws of physics, yet this turbine had been turned backwards and unattached from its mounting base. One of the Lexan blades approximately 10 tiers up had also been broken This was also very suspicious because the blades are constructed of 1/4" lexan and are virtually unbreakable.

A second suspicious incident occurred on June 1, 2011 when someone walked into Jonestown Wind Project Office and stole laptop computer. This incident occurred in broad daylight during lunch time and the only thing taken was that one laptop. (Case # 11-014197) There was a lot of valuable information concerning the program on that laptop.

The third suspicious incident concerned his personal motorcycle. He stated that he had taken his motorcycle into a dealership for service and he got a phone call from the mechanic asking him if he had any enemies because someone had apparently tampered with the front tire of his motorcycle. When Mr. Malouff went to the dealership they showed him the front tire of his motorcycle where someone had apparently taken a very sharp object and cut two slices in the front tire, each being approximately 10" long and 1/4" deep. This could have easily have caused the front tire to blow out if the bike was taken to highway speeds and expanded. The result would have been a loss of control of the bike and possibly a serious accident. Mr. Malouff stated that the only place that this damage could have possibly taken place was at his residence on Lafayette Park Drive here in Jonestown. This was especially problematic because virtually no one knows where he lives.

This morning when they went to inspect the turbines after last nights thunderstorms, they found that two of them were damaged. One of them was broken at a shaft joint and a lexan blade was cracked. A second turbine was broken with one of the blades about 10 tiers up broken and shattered into about 40 pieces. This type of shattering was uncharacteristic of lexan and the damage that was observed was not caused by the wind as the winds experienced during the storm were well within the tested abilities of the turbines. According to Mr. Malouff the only way the blade could be shattered in that manner was for one or two people to climb up and hang from the blade and twist it to cause it to shatter. Also found on the ground was a white hard hat that was nothing like the ones worn by Jonestown employees or those of CM energies. The hard hat had the name "King" written on the inside and based on the dirt on it, it had been at the scene through the rainstorm.

The last time that the turbines were for sure intact was about Friday 6/17/2011. Mr. Malouff states that there are of people that would like to see this project to fail including some previous employees and also a group from Leander who is in litigation with the City over patent rights on the wind turbines.

| Officer ID: *Chief John Stetar*  2134 | Reviewed By: | Approved: | Date: / / |
|---|---|---|---|

| JONESTOWN | Page | 4 | Case No. 11-014356 | |
|---|---|---|---|---|
| **POLICE DEPARTMENT** | | | Type: *Offense* | Seq: *1* |
| Crime / Incident (Primary) 28.03 PC *Criminal Mischief* | | Attempt ☐ | **Narrative Report** | |

*The hard hat was taken into possession to be processed as evidence. Arrangements were alos made to have a uniformed officer meet Mr. Malouff at the turbine site to gather evidence and further document the area.*

| Officer ID: *Chief John Stefar* | *2134* | Reviewed By: | Approved: | Date: / / |
|---|---|---|---|---|

*5*

| JONESTOWN | Page | **1** | **Incident Supplement Page** |
|---|---|---|---|

**JONESTOWN**
**POLICE DEPARTMENT**
18304 NORTH PARK DR
JONESTOWN, TEXAS 78645

| | Case No. **11-014356** |
|---|---|
| Reported | 07/19/2011    09:15    Tuesday |

Title: *Follow-up*

On July 15, 2011 at about 0930 I received a phone call from Mr. Charles Malouff concerning some damage that had occurred to the wind turbines that are part of the C.M. Energies wind project. Mr. Malouff stated that he believes that he now has evidence as to how the one turbine was damaged to the point that it came apart at the joint. Charles asked me if I could meet him at the wind turbine site on Live Oak and he would show me what he was talking about. I informed him that I was tied up at that point but that I would meet him up there at the site after 1:00 pm and that I would call him when I was on the way there.

At about 2:00 pm, I called and told Mr. Malouff that I was enroute to the wind turbine site and he told me that he would meet me there. I arrived at the site a few minutes later and Mr. Malouff arrived shortly thereafter. Charles directed me to the one turbine that had been broken off. We then looked through the space where the air conditioner would normally be placed and he showed me that there was a piece of plastic strap that he referred to as "mule tape" wrapped around the base of the turbine's aluminum shaft and there was a piece of rope similar to clothes line attached to the strap and hanging down. Mr. Malouff stated that it appears that the rope had been tied on and then put out through the air conditioner window and then tied to base of the support structure. There was some scratching on the base where the rope may have been attached. According to Mr. Malouff this would have prevented the turbine from turning and thus in high winds like we had when the turbine was broken it may have resulted in the observed damage. Photographs where taken on the strap, rope and frame scratches for enclosure in the case file.
We inspected the other turbines in the area but no similar attachments were found.

| Officer ID: | | Agency: | Reviewed By: | | Date: |
|---|---|---|---|---|---|
| *Chief John Stotar* | 2134 | JPD | | | / / |

6





# SECO Stimulus Reporting

**Your session expires in:**

# 2 9  4 8

**mins  secs**

Report Contract Information

Logged in as:  Justin M Shepherd

## This report has been finalized.

> ### Take me to Vendor Payments Information

> Return to Contracts Menu

---

**Contract CS0951 : for City of Jonestown , State Energy Program**
**Report for July 2011**

Amount of electricity generated from wind systems (MWh) (0-9,999,999): 0

Number of wind energy systems installed (0-9,999,999): 2

Total capacity of wind energy systems installed (kW) (0-9,999,999): 40

Dollar amount of required match you provided for your State Energy Program award? (0.00-9,999,999.99): 459652.00

## What funds, if any, have been leveraged?

Utility Incentive (enter whole dollars only) (0-9,999,999): 0

State Funds (enter whole dollars only) (0-9,999,999): 0

Local Funds (enter whole dollars only) (0-9,999,999): 0

Private (enter whole dollars only) (0-9,999,999): 0

Other Federal (enter whole dollars only) (0-9,999,999): 0

In-kind (enter whole dollars only) (0-9,999,999): 459652

Other (enter whole dollars only) (0-9,999,999): 0

Please discuss progress to date on your project deliverables: (min 3 char):

(Limited to 3-2,000 Chars)

Many of the materials have been purchased and Systems are being installed.

Compare your actual accomplishments with the goals and objectives for the reporting period:

(Limited to 3-2,000 Chars)

Sites have been selected, most of the materials/equipment have been received, and installation process still underway.

Please explain any problems you have encountered: (min 3 char):

(Limited to 3-2,000 Chars)

There was no work performed on the project this period due to excessive heat and fire hazard delays. Aside from delays with Buy American and extreme heat and fire hazards, several systems were vandalized and the location is still an active crime scene.

Were you able to overcome the problems?:

(Limited to 2-2,000 Chars)

We have not been able to overcome the delays with extreme heat and fire delays and the one location where the systems were vandalized is designed for nine systems. Three were in the installation process when the vandalism first occurred but the whole project area has been determined a crime scene and further work at that site is currently delayed.

Are there difficulties impacting your project deliverables or timeline:

(Limited to 2-2,000 Chars)

Even with the delays, heat, and vandalism, this project has not been significantly delayed and is still considered on schedule. However, should these extreme heat and fire hazard issues and crime scene issues continue for an extended period of time, they may delay the project.

Please discuss any successes you have experienced:

(Limited to 3-2,000 Chars)

$1,836,400.00 has been procured for materials/equipment and subcontract and the project has seen successful implementation of the installation process.

Have there been allegations of fraud, waste, or abuse made against your entity/contractors? (Yes/No): No

If there have been allegations of fraud, waste, or abuse made, please describe in detail.:

(Limited to 3-2,000 Chars)

N/A

Please provide a summary of expenditures to date:

(Limited to 3-2,000 Chars)

$1,466,400.00 has been expended for materials/equipment and $370,000.00 has been expended for subcontract.

Obligations (Recovery Act funds encumbered) (0-9,999,999): 0

Outlays (Expenditure of Non-Federal funds) (0-9,999,999): 0

Outlays (Expenditure of Recovery Act funds) (0-9,999,999): 0

Have you expended more than $500,000 from ANY federal source during this fiscal year? (Yes/No): Yes

# RESOLUTION

We certify that:

       We are the duly qualified and acting directors of CM Alternative Energies, Inc., a Texas Corporation, a duly organized and existing corporation and in good standing with the State of Texas.

       The following is a true copy of a resolution duly adopted by the directors of the corporation at a meeting legally held on _____, and entered in the minutes of such meeting in the Minute Book of the corporation:

       "RESOLVED, that the CEO of this company, Charles Malouff is hereby authorized and directed to obtain a loan in the amount of $2,000.00 from the Taylor Economic Development Corporation for transportation charges in establishing a wind energy R&D center in Taylor, Texas."

       "RESOLVED, FURTHER, that the CEO is authorized and directed to execute all instruments necessary to effect the loan above described including all loan instruments and related instruments."

       The above resolution is in conformity with the Articles of Organization and Regulations of the corporation, has never been repealed, and is now in full force and effect.

Dated: _____, 2009


               CM Alternative Energies, Inc.


               By: _____
               Its: Director


               By: _____
               Its: Director

       1

STATE OF TEXAS
COUNTY OF WILLIAMSON

BEFORE ME, the undersigned authority, on this day personally appeared _____, Director, known to me to be the person whose name is subscribed to the foregoing instrument, and swore and acknowledged to me that (s)he executed the same for the purposes and consideration therein expressed, and in the capacity therein stated and as the act and deed of the company.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, this the ____ day of _____, 2009.

_____
Notary Public in and for
The State of Texas

STATE OF TEXAS
COUNTY OF WILLIAMSON

BEFORE ME, the undersigned authority, on this day personally appeared _____, Director, known to me to be the person whose name is subscribed to the foregoing instrument, and swore and acknowledged to me that (s)he executed the same for the purposes and consideration therein expressed, and in the capacity therein stated and as the act and deed of the company.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, this the ____ day of _____, 2009.

_____
Notary Public in and for
The State of Texas

2

10




TAYLOR
THE ZEST OF TEXAS

January 25, 2012


Charles Malouff
CM Alternative Energies, Inc.
P.O. Box 26041
Austin, TX 78755


Dear Mr. Malouff:

The Taylor Economic Development Corporation Board of Directors approved an early closeout of your $2,000 loan dated March 23, 2009. This loan has been forgiven by the Taylor EDC and is now closed because CM Alternative Energies met the performance requirements of the note.

Since $1,700 of the $2,000 Promissory note was provided to you, you will be receiving a 1099 in the amount of $1,700 in January 2012 for tax year 2011.

If you have any questions or need additional, please contact Jason Ford at 512-352-4321 or Carrie Orts at 512-352-4325.

Best regards,

Jason Ford
President/CEO

CM ENERGIES WIND ENERGY SYSTEM IN
TAYLOR, TEXAS.
NOT PART OF THE GRANT.
CONNECTED TO THE GRID.
USED FOR R&D ALSO.

12.


**RE: project engineer**

Friday, December 17, 2010 8:43 AM

From:

To:

"Steven Winton" <swinton@bechtel-s.com>

"'cmenergies'" <cmenergies@yahoo.com>

Charlie,

I'm honored to be asked. I'm meeting with Paul this afternoon. I'll discuss it with him and get his buy in general. Then we can work out the specifics

How many hours do you think are involved right now? I know that it will increase as we acquire more projects?

Steven L. Winton, P. E.

Bechtel-S Corporation

P. O. Box 103

Gonzales, TX 78629-0103

swinton@bechtel-s.com

(830) 672-2902      FREE (830) 672-2902  (Office)

(830) 672-7761 (Fax)

(512) 413-2724      FREE (512) 413-2724  (Cell)

**From:** cmenergies [mailto:cmenergies@yahoo.com]
**Sent:** Thursday, December 16, 2010 11:43 AM
**To:** steve winton
**Subject:** project engineer

Steve,

Fred Herber, our Project Engineer, has decided now is the time he wants to retire. That said, I would like you to come on as our Project Engineer. Since this is DOE there is Davis Bacon, Certified Payroll and weekly reporting issues that has to be considered. Give me a call or can you come out this way so we

13

can sit and see what is the best way to handle this. We were employing Fred direct so he didnt have to do all of that paperwork.

My cell is 512.845.0252        FREE 512.845.0252 .

Thanks,

Charlie

Charlie Malouff
CM Energies
P.O. Box 5337
Jonestown, TX 78645

512.796.7000        FREE 512.796.7000
www.cmenergies.com

All non-Operations mail should be addressed to:
CM Energies
P.O. Box 118
Cedar Park, Texas 78630-0118

Privileged and Confidential Communication

The information contained in this e-mail message may involve confidential and privileged material that is solely transmitted for the purposes of the intended recipients. If the reader of this message is not an intended recipient, or if this message has been inadvertently directed to your attention, you are hereby notified that you have received this message and any attached documents in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this message in error, please notify us immediately by return e-mail and delete and destroy all copies of the original message.

You'll need Skype Credit

## RE: project engineer 2

TO: 1 More1 recipient
CC: recipientsYou More
BCC: recipientsYou
Hide Details
FROM:

- cmenergies

TO:

- Steven Winton

Message flagged
Friday, December 17, 2010 9:26 AM
Ok..computer is back up.
Reitterating our phone conversation, Fred, our retiring PE has been talking with us over the last 10 months about depths of the drill shaft foundations. Now that he is retiring, he wants me to confer with our new PE. We are using 24" outer diameter, 55-5800psi concrete, and have previously determined a depth of 22 + feet in farm dirt (soil) and while he mentioned 4 x the diameter = 8 feet deep in bedrock, which covers most, if not all, of Jonestown, we are erring on the side of caution and drilling 10 feet deep. We are allowing no less than 16 days to cure and using 1.5" steel bolts and #8 rod the length of the concrete and #4 carrier every 16" on center. Rebar is 18" diameter. Jonestown has an average of 4 feet of bedrock over Lime/sandstone. What we have uncovered on area hillsides that have been cut out is 3-5 feet bedrock depending on the hill. Little to no surface topsoils.
Do you feel we need a soil sample at each site based on this information?
Attached is our newest and probably last tower/set-up design. Any other changes will be on electronics and maybe blade diameter and sail heights. There is 12' between each of the tower legs and it sits free over the base which is 8" x 8' x 6' H. The tower legs are 4" x 4" x 1/2" thick steel. Tower struts are welded. Also attached is our current Rated Power Curve using our new alternator system. Its a dual core (for lack of a better term) alternator system. Aaron, my electrical engineer feels we should actually get about 10% less for functional power, and that is based on real time resistances and weather dynamics. Each system will fluxuate a percentage +/- .
Best,
Charlie

Charlie Malouff
CM Energies
P.O. Box 5337
Jonestown, TX 78645
512.796.7000 begin_of_the_skype_highlighting 512.796.7000 end_of_the_skype_highlighting
www.cmenergies.com

All non-Operations mail should be addressed to:
CM Energies
P.O. Box 118
Cedar Park, Texas 78630-0118

Privileged and Confidential Communication

The information contained in this e-mail message may involve confidential and privileged material that is

solely transmitted for the purposes of the intended recipients. If the reader of this message is not an intended recipient, or if this message has been inadvertently directed to your attention, you are hereby notified that you have received this message and any attached documents in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this message in error, please notify us immediately by return e-mail and delete and destroy all copies of the original message.

--- On **Fri, 12/17/10, Steven Winton <*swinton@bechtel-s.com*>** wrote:

From: Steven Winton <swinton@bechtel-s.com>
Subject: RE: project engineer
To: "'cmenergies'" <cmenergies@yahoo.com>
Date: Friday, December 17, 2010, 8:43 AM

Charlie,

I'm honored to be asked. I'm meeting with Paul this afternoon. I'll discuss it with him and get his buy in general. Then we can work out the specifics

How many hours do you think are involved right now? I know that it will increase as we acquire more projects?

Steven L. Winton, P. E.

Bechtel-S Corporation

P. O. Box 103

Gonzales, TX 78629-0103

swinton@bechtel-s.com

(830) 672-2902 begin_of_the_skype_highlighting (830) 672-2902 end_of_the_skype_highlighting (Office)

(830) 672-7761 (Fax)

(512) 413-2724 begin_of_the_skype_highlighting (512) 413-2724 end_of_the_skype_highlighting (Cell)

From: cmenergies [mailto:cmenergies@yahoo.com]
Sent: Thursday, December 16, 2010 11:43 AM
To: steve winton
Subject: project engineer

Steve,

Fred Herber, our Project Engineer, has decided now is the time he wants to retire. That said, I would like you to come on as our Project Engineer. Since this is DOE there is Davis Bacon, Certified Payroll and weekly reporting issues that has to be considered. Give me a call or can you

16

come out this way so we can sit and see what is the best way to handle this. We were employing Fred direct so he didnt have to do all of that paperwork.

My cell is 512.845.0252 begin_of_the_skype_highlighting 512.845.0252 end_of_the_skype_highlighting.

Thanks,

Charlie

Charlie Malouff
CM Energies
P.O. Box 5337
Jonestown, TX 78645
512.796.7000 begin_of_the_skype_highlighting 512.796.7000 end_of_the_skype_highlighting
www.cmenergies.com

All non-Operations mail should be addressed to:
CM Energies
P.O. Box 118
Cedar Park, Texas 78630-0118

Privileged and Confidential Communication

The information contained in this e-mail message may involve confidential and privileged material that is solely transmitted for the purposes of the intended recipients. If the reader of this message is not an intended recipient, or if this message has been inadvertently directed to your attention, you are hereby notified that you have received this message and any attached documents in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this message in error, please notify us immediately by return e-mail and delete and destroy all copies of the original message.

**2** Attached files| **1.5MB**

1.  14th generation HillsideAssembly Updated 12-02-2010.pdf
2.  Generator Rated Power Curve 17 Nov 2010.pdf

Download All

# CME WES *1*

TO: 4 More4 recipients
CC: recipientsYou More
BCC: recipientsYou
Hide Details
FROM:

- cmenergies

TO:

- paul bechtel
- steve winton
- mike guevara
- rob mclauchlan

Message flagged
Sunday, February 13, 2011 8:45 PM
This is from this morning. We had wind gusts up to 40 mph. The guys had a vertical laser to check the flex on the shaft. We are within tolerances. Please limit dissimination until the ribbon cutting in JT or as close to as possible. Thank you.

Charlie Malouff
CM Energies
P.O. Box 5337
Jonestown, TX 78645
512.796.7000 begin_of_the_skype_highlighting 512.796.7000 end_of_the_skype_highlighting
www.cmenergies.com

All non-Operations mail should be addressed to:
CM Energies
P.O. Box 118
Cedar Park, Texas 78630-0118

Privileged and Confidential Communication

The information contained in this e-mail message may involve confidential and privileged material that is solely transmitted for the purposes of the intended recipients. If the reader of this message is not an intended recipient, or if this message has been inadvertently directed to your attention, you are hereby notified that you have received this message and any attached documents in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this message in error, please notify us immediately by return e-mail and delete and destroy all copies of the original message.

Need Mail bonding?
Go to the <u>Yahoo! Mail Q&A</u> for <u>great tips from Yahoo! Answers</u> users.
**1** Attached file| **2.5**MB

1.        <u>CM Energies Wind Energy System 2-13-11.wmv</u>

<u>Download</u>

## Re: CME WES

TO: 1 More1 recipient
CC: recipientsYou More
BCC: recipientsYou
Hide Details
FROM:

- cmenergies@yahoo.com

TO:

- Steven Winton

Message flagged
Monday, February 14, 2011 8:06 AM
Thanks. You, for sure, need to use it in the baa presentation, but by then ill have another with it connected at the water treatment plant.

Sent from my BlackBerry® smartphone with Nextel Direct Connect

From: "Steven Winton" <swinton@bechtel-s.com>
Date: Mon, 14 Feb 2011 08:06:27 -0600
To: 'cmenergies'<cmenergies@yahoo.com>
Subject: RE: CME WES

Charlie,

Congratulations! The unit looks really good. Thanks for the video. I won't show it until after the grand opening in JT.

Steven L. Winton, P. E.

Bechtel-S Corporation

P. O. Box 103

Gonzales, TX 78629-0103

swinton@bechtel-s.com

(830) 672-2902 begin_of_the_skype_highlighting (830) 672-2902 end_of_the_skype_highlighting (Office)

(830) 672-7761 (Fax)

26

(512) 413-2724 begin_of_the_skype_highlighting (512) 413-2724 end_of_the_skype_highlighting (Cell)

From: cmenergies [mailto:cmenergies@yahoo.com]
Sent: Sunday, February 13, 2011 8:46 PM
To: paul bechtel; steve winton; mike guevara; rob mclauchlan
Subject: CME WES

This is from this morning. We had wind gusts up to 40 mph. The guys had a vertical laser to check the flex on the shaft. We are within tolerances. Please limit dissimination until the ribbon cutting in JT or as close to as possible. Thank you.

Charlie Malouff
CM Energies
P.O. Box 5337
Jonestown, TX 78645
512.796.7000 begin_of_the_skype_highlighting 512.796.7000 end_of_the_skype_highlighting
www.cmenergies.com

All non-Operations mail should be addressed to:
CM Energies
P.O. Box 118
Cedar Park, Texas 78630-0118

Privileged and Confidential Communication

The information contained in this e-mail message may involve confidential and privileged material that is solely transmitted for the purposes of the intended recipients. If the reader of this message is not an intended recipient, or if this message has been inadvertently directed to your attention, you are hereby notified that you have received this message and any attached documents in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this message in error, please notify us immediately by return e-mail and delete and destroy all copies of the original message.

Need Mail bonding?
Go to the Yahoo! Mail Q&A for great tips from Yahoo! Answers users.

## resume

TO: 1 More1 recipient
CC: recipientsYou More
BCC: recipientsYou
Hide Details
FROM:

- cmenergies

TO:

- rob mclauchlan

Message flagged
Monday, February 21, 2011 12:07 PM
Rob,
We are putting in for some DoD and other opportunities. I need to get a resume from you if you can. Thanks.

Charlie Malouff
CM Energies
P.O. Box 5337
Jonestown, TX 78645
512.796.7000 begin_of_the_skype_highlighting 512.796.7000 end_of_the_skype_highlighting
www.cmenergies.com

All non-Operations mail should be addressed to:
CM Energies
P.O. Box 118
Cedar Park, Texas 78630-0118

Privileged and Confidential Communication

The information contained in this e-mail message may involve confidential and privileged material that is solely transmitted for the purposes of the intended recipients. If the reader of this message is not an intended recipient, or if this message has been inadvertently directed to your attention, you are hereby notified that you have received this message and any attached documents in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this message in error, please notify us immediately by return e-mail and delete and destroy all copies of the original message.

22

## Re: Resumes

- cmenergies@yahoo.com

TO:

- Paul Bechtel

Message flagged
Tuesday, February 22, 2011 11:17 AM
Hi Paul,
Will have several docs for you. Missing 2 resumes. Already on them.

Sent from my BlackBerry® smartphone with Nextel Direct Connect

---

**From:** "Paul Bechtel" <pbechtel@bechtel-s.com>
**Date:** Tue, 22 Feb 2011 11:16:22 -0600
**To:** <charlie@cmenergies.com>
**Subject:** Resumes

Hi Charlie.. Working away on the proposal. Shoot me resumes when you get a chance. I know we have some time, but I like to get these things done quickly in the early part of the schedule so that I have time to check the details. We have time this week, so send em if you can. Thanks for having me out.

Paul B

## revised resume *1*

TO: 2 More2 recipients
CC: recipientsYou More
BCC: recipientsYou
Hide Details
FROM:

- cmenergies

TO:

- Mike Guevara
- mike guevara

Message flagged
Wednesday, February 23, 2011 3:46 PM
Mike,
We need to get Paul and Steve resumes for the DoD proposal asap. I know you're burdened....I took the liberty of updating your resume from 2009. If you can, please take a look. If you need to make changes, do so and email me back the finished product. Ill scan and pdf and get to Paul. Thanks.

Charlie Malouff
CM Energies
P.O. Box 5337
Jonestown, TX 78645
512.796.7000 begin_of_the_skype_highlighting 512.796.7000 end_of_the_skype_highlighting
www.cmenergies.com

All non-Operations mail should be addressed to:
CM Energies
P.O. Box 118
Cedar Park, Texas 78630-0118

Privileged and Confidential Communication

The information contained in this e-mail message may involve confidential and privileged material that is solely transmitted for the purposes of the intended recipients. If the reader of this message is not an intended recipient, or if this message has been inadvertently directed to your attention, you are hereby notified that you have received this message and any attached documents in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this message in error, please notify us immediately by return e-mail and delete and destroy all copies of the original message.

1 Attached file| 76KB

24

# FW: ESTCP Energy Solicitation Just Released! *1*

TO: 1 More1 recipient
CC: recipientsYou More
BCC: recipientsYou
Hide Details
FROM:

- cmenergies

TO:

- rob mclauchlan

Message flagged
Thursday, February 24, 2011 6:45 AM
Rob,
I put a sticky note on the pdf. Not sure if it saved. Just in case, we are going after Section 2.
However, with our Systems, Section 2 leads into the other 3.
Let me know if you have questions. Thanks.

Charlie Malouff
CM Energies
P.O. Box 5337
Jonestown, TX 78645
512.796.7000 begin_of_the_skype_highlighting 512.796.7000 end_of_the_skype_highlighting
www.cmenergies.com

All non-Operations mail should be addressed to:
CM Energies
P.O. Box 118
Cedar Park, Texas 78630-0118

Privileged and Confidential Communication

The information contained in this e-mail message may involve confidential and privileged material that is solely transmitted for the purposes of the intended recipients. If the reader of this message is not an intended recipient, or if this message has been inadvertently directed to your attention, you are hereby notified that you have received this message and any attached documents in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this message in error, please notify us immediately by return e-mail and delete and destroy all copies of the original message.

--- On **Thu, 2/3/11, Steven Winton** <*swinton@bechtel-s.com*> wrote:

From: Steven Winton <swinton@bechtel-s.com>

25

Subject: FW: ESTCP Energy Solicitation Just Released!
To: "Charlie Malouff" <charlie@cmenergies.com>
Cc: "'Paul Bechtel'" <pbechtel@bechtel-s.com>
Date: Thursday, February 3, 2011, 3:14 PM

Charlie,

Do you have any interest in pursuing a DoD grant? We would be glad to help since we are a DoD contractor.

We can discuss next week if you're interested.

Steven L. Winton, P. E.
Bechtel-S Corporation
P. O. Box 103
Gonzales, TX 78629-0103
swinton@bechtel-s.com
(830) 672-2902 begin_of_the_skype_highlighting (830) 672-2902
end_of_the_skype_highlighting (Office)
(830) 672-7761 (Fax)
(512) 413-2724 begin_of_the_skype_highlighting (512) 413-2724
end_of_the_skype_highlighting (Cell)


JUST RELEASED! ESTCP FY 2012 INSTALLATION ENERGY SOLICITATION


The Department of Defense's (DoD) Environmental Security Technology Certification Program (ESTCP) released its FY 2012 Energy Solicitation on February 1, 2011, requesting proposals for demonstration of installation energy technologies.

<http://www.serdp-estcp.org/var/ezflow_site/storage/images/media/serdp-e stcp/images/logos/estcp-logo-wide-rgb/98548-1-eng-US/ESTCP-Logo-Wide-RGB _medium.jpg>

The DoD Call for Proposals, Broad Agency Announcement (BAA), and Non-DoD Federal Call for Proposals request pre-proposals for the following topics: (1) Smart Micro-grids and Energy Storage to Increase Energy Security on DoD Installations; (2) Renewable Energy Generation on DoD Installations; (3) Advanced Component Technologies to Improve Building Energy Efficiency; (4) Advanced Building Energy Management and Control; and (5) Tools and Processes for Design, Assessment and Decision-making Associated with Energy Use and Management.

Researchers from Federal organizations, universities, and private industry can apply for ESTCP funding.

26

The due date for all pre-proposals is Thursday, March 24, 2011. More information about the solicitation, including instructions and deadlines, is available on the SERDP and ESTCP web site at
http://www.serdp-estcp.org/Funding-Opportunities/ESTCP-Solicitations/Installation-Energy-Solicitation
<blockedhttp://click.icptrack.com/icp/relay.php?r=59822089&msgid=614748&act=RNCL&c=498043&destination=http%3A%2F%2Fwww.serdp-estcp.org%2FFunding-Opportunities%2FESTCP-Solicitations%2FInstallation-Energy-Solicitation>

WEBINAR FOR THE ESTCP INSTALLATION ENERGY SOLICITATION - February 10: ESTCP Director Dr. Jeffrey Marqusee will conduct an online seminar "ESTCP Energy Funding Opportunities" on February 10, 2011, from 12:00-1:00 p.m. EST. This "how to play" briefing will offer valuable information for those interested in new ESTCP funding opportunities related to energy topics. During the online seminar, participants may ask questions about the funding process, the current ESTCP solicitation, and the proposal submission process. Pre-registration for this webinar is required. To register, visit https://cc.readytalk.com/r/gk1t8vm3s4tn
<blockedhttp://click.icptrack.com/icp/relay.php?r=59822089&msgid=614748&act=RNCL&c=498043&destination=https%3A%2F%2Fcc.readytalk.com%2Fr%2Fgk1t8vm3s4tn> . If you have difficulty registering, please contact the ESTCP Office at jbunger@hgl.com or by telephone at 703-696-2126 begin_of_the_skype_highlighting 703-696-2126 end_of_the_skype_highlighting.

This message was sent from SERDP-ESTCP to kimberly.watts@us.army.mil. It was sent from: SERDP-ESTCP Support Office at HGL, 11107 Sunset Hills Road, Suite 400, Reston, VA 20190. You can modify/update your subscription via the link below. Email Marketing by
<blockedhttp://www.icontact.com/a.pl/144186>
iContact - Try It Free! <blockedhttp://www.icontact.com/a.pl/144186>
<http://app.icontact.com/icp/static/images/icons/email_manage_subscription.png> To be removed click here
<blockedhttp://app.icontact.com/icp/mmail-mprofile.pl?r=59822089&l=69128&s=RNCL&m=614748&c=498043>
<http://click.icptrack.com/icp/track.php?msgid=614748&act=RNCL&r=59822089&c=498043>

1 Attached file| 77KB

1.        FY12_ESTCP_Energy_BAA_Description.pdf

Download

## Re: 3 page info

TO: 1 More1 recipient
CC: recipientsYou More
BCC: recipientsYou
Hide Details
FROM:

- cmenergies@yahoo.com

TO:

- Paul Bechtel

Message flagged
Friday, March 11, 2011 12:16 PM
Paul, somehow my phone does not have you programed in. Can you call me? 512-845-0252 begin_of_the_skype_highlighting 512-845-0252 end_of_the_skype_highlighting.

Sent from my BlackBerry® smartphone with Nextel Direct Connect

---

**From:** "Paul Bechtel" <pbechtel@bechtel-s.com>
**Date:** Fri, 11 Mar 2011 11:35:22 -0600
**To:** 'cmenergies'<cmenergies@yahoo.com>
**Subject:** RE: 3 page info

Are you opposed to me using any of the photos that you send me in talking with individuals from the Army, Air Force, or Corps of Engineers ? you sent me photos of your new blades and photos of the unit in the supplemental data document.

Thanks in advance.

Paul B

**From:** cmenergies [mailto:cmenergies@yahoo.com]
**Sent:** Monday, March 07, 2011 7:02 PM
**To:** paul bechtel
**Subject:** 3 page info

Paul,

I have to be in San Marcos all day tomorrow. I am leaving around 0830. Let me know before that if you need more or there needs to be changes. I left this in word so you can edit if you have to.

Charlie Malouff

28

CM Energies
P.O. Box 5337
Jonestown, TX 78645
512.796.7000 begin_of_the_skype_highlighting 512.796.7000 end_of_the_skype_highlighting
www.cmenergies.com

All non-Operations mail should be addressed to:
CM Energies
P.O. Box 118
Cedar Park, Texas 78630-0118

Privileged and Confidential Communication

The information contained in this e-mail message may involve confidential and privileged material that is solely transmitted for the purposes of the intended recipients. If the reader of this message is not an intended recipient, or if this message has been inadvertently directed to your attention, you are hereby notified that you have received this message and any attached documents in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this message in error, please notify us immediately by return e-mail and delete and destroy all copies of the original message.

29

# Re: data

TO: 1 More1 recipient

CC: recipientsYou More

BCC: recipientsYou

Hide Details

FROM:

- cmenergies@yahoo.com

TO:

- Paul Bechtel

Message flagged
Wednesday, March 16, 2011 10:20 PM

Ok. Thanks.

Sent from my BlackBerry® smartphone with Nextel Direct Connect

---

**From:** "Paul Bechtel" <pbechtel@bechtel-s.com>

**Date:** Wed, 16 Mar 2011 22:22:07 -0500

**To:** 'cmenergies'<cmenergies@yahoo.com>

**Subject:** RE: data

Ok. Our pencils down deadline is Friday. We will look for it.

P

**From:** cmenergies [mailto:cmenergies@yahoo.com]
**Sent:** Wednesday, March 16, 2011 10:10 PM
**To:** Paul Bechtel
**Subject:** Re: data

Paul,

We are going to get you something!! It may be late, but we will have something you can take to them.

Charlie Malouff
CM Energies
P.O. Box 5337
Jonestown, TX 78645
512.796.7000 begin_of_the_skype_highlighting 512.796.7000 end_of_the_skype_highlighting
www.cmenergies.com

All non-Operations mail should be addressed to:
CM Energies
P.O. Box 118
Cedar Park, Texas 78630-0118

Privileged and Confidential Communication

The information contained in this e-mail message may involve confidential and privileged material that is solely transmitted for the purposes of the intended recipients. If the reader of this message is not an intended recipient, or if this message has been inadvertently directed to your attention, you are hereby notified that you have received this message and any attached documents in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this message in error, please notify us immediately by return e-mail and delete and destroy all copies of the original message.

--- On **Wed, 3/16/11, Paul Bechtel <_pbechtel@bechtel-s.com_>** wrote:

From: Paul Bechtel <pbechtel@bechtel-s.com>
Subject: data
To: cmenergies@yahoo.com
Date: Wednesday, March 16, 2011, 9:31 PM

Hi Charlie. I don't need an answer tonight, but in talking with energy gurus in the military, I am getting this:

• There is a lot of competition.

• Although this all looks promising, I am concerned that if we cannot show performance..results..then they may not consider this under the ESTCP program…they have limitations.

31

• In a stack of proposals..those with some real validation data against those that do not......those with some proveout data in hand will probably be selected.

We anticipated completing the proposal Friday. If you could get me something Thursday, that would be great.

Thank you.

Paul b

## competitors

TO: 2 More2 recipients
CC: recipientsYou More
BCC: recipientsYou
Hide Details
FROM:

- cmenergies

TO:

- paul bechtel
- steve winton

Message flagged
Friday, March 18, 2011 4:40 PM
Paul and Steve,
We are pretty familiar with most of the vertical wind competitors. When I bring on new people we search them out then chew them up. Capabilities, cost, american to chinese, etc...let me know who we are up against and Ill tell you what we know. thanks

Charlie Malouff
CM Energies
P.O. Box 5337
Jonestown, TX 78645
512.796.7000 begin_of_the_skype_highlighting 512.796.7000 end_of_the_skype_highlighting
www.cmenergies.com

All non-Operations mail should be addressed to:
CM Energies
P.O. Box 118
Cedar Park, Texas 78630-0118

Privileged and Confidential Communication

The information contained in this e-mail message may involve confidential and privileged material that is solely transmitted for the purposes of the intended recipients. If the reader of this message is not an intended recipient, or if this message has been inadvertently directed to your attention, you are hereby notified that you have received this message and any attached documents in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this message in error, please notify us immediately by return e-mail and delete and destroy all copies of the original message.

33

# Re: Afghanistan

TO: 1 More1 recipient
CC: recipientsYou More
BCC: recipientsYou
Hide Details
FROM:

- cmenergies

TO:

- Paul Bechtel

Message flagged
Monday, September 12, 2011 12:09 PM
Is this through an American solicitation? Quazi (Martech) is focusing on Asia right now.
Morocco, Bangledesh, Philippines, Malaysia. I am open to Afghanistan.

Charlie Malouff
CM Energies
P.O. Box 5337
Jonestown, TX 78645
512.796.7000 begin_of_the_skype_highlighting 512.796.7000 end_of_the_skype_highlighting
www.cmenergies.com

All non-Operations mail should be addressed to:
CM Energies
P.O. Box 118
Cedar Park, Texas 78630-0118

Privileged and Confidential Communication

The information contained in this e-mail message may involve confidential and privileged
material that is solely transmitted for the purposes of the intended recipients. If the reader of this
message is not an intended recipient, or if this message has been inadvertently directed to your
attention, you are hereby notified that you have received this message and any attached
documents in error and that any review, dissemination, distribution, or copying of this message is
strictly prohibited. If you have received this message in error, please notify us immediately by
return e-mail and delete and destroy all copies of the original message.

**From:** Paul Bechtel <pbechtel@pbainc.com>
**To:** cmenergies@yahoo.com
**Sent:** Monday, September 12, 2011 12:03 PM
**Subject:** Afghanistan

34

Do you have any interest in supplying energy in Afghanistan ? If so, would we be able to strike an agreement like the one we just signed for work for govt, schools, etc in Afghanistan ?
Is that an area that we can work together in ? I may be able to develop opportunities there in the near term, if this is an area that is of interest to you.
I am stuck on calls until about 3. If you have time, we can talk this week at your convenience.
Paul Bechtel

# MARKETING AND TEAMING AGREEMENT

THIS AGREEMENT is entered into this 16th day of August (the *"Effective Date"*) between PB&A, Inc. (f/k/a Bechtel-S Corporation) a Texas corporation (herein referred to as *"PB&A"* or *"Prime"*), having an office at 701 Lavaca Street, Suite 607, Austin, Texas 78701, and CM Alternative Energies, Inc.(hereinafter referred to as *"CM ENERGIES"* or *"Subcontractor"*) having an address at P.O. Box 5337 Jonestown, Texas 78645 , collectively referred to hereinafter as "the parties."

## RECITALS:

1. WHEREAS, the parties wish to enter into a relationship for the marketing, sales, manufacturing, installation and maintenance of CM ENERGIES wind energy systems, as they may exist now or in the future, together with any improvements, components, or related equipment (the *"Systems"*) to various agencies of the U.S. Government, to include the U.S. Military and their NATO affiliates (the *"Government Market"*)

2. WHEREAS, PB&A has marketing capabilities, familiarity with the Government Market, and engineering capabilities

3. WHEREAS, CM ENERGIES has capability to manufacture, install, and maintain CM ENERGIES wind energy systems.

NOW, THEREFORE, the parties agree as follows:

1. <u>Marketing</u>. PB&A shall have the exclusive right to market and sell the Systems in the Government Market. PB&A shall use its reasonable efforts to market the Systems in the Government Market, in a manner that it deems appropriate. PB&A does not guarantee that any sales will be made and does not promise any level of sales or profits for CM ENERGIES.

2. <u>Supply</u>. During the Term, and during the term of any contract entered into in the Government Market, CM ENERGIES shall manufacture, deliver, install, and maintain the Systems pursuant to contracts in the Government Market. Such contracts typically require such equipment to supply energy for twenty years.

3. <u>Allocation of Work</u>. The parties' respective anticipated roles and responsibilities are more specifically described in <u>Exhibit A</u>.

4. <u>Designated Representatives</u>. The parties shall each designate one or more individuals within their respective organizations as their representative(s) responsible for directing performance of the parties' obligations under this Agreement.

5. <u>Terms of Proposals</u>. Proposals submitted to the Government Market for the supply installation and maintenance of the Systems shall include the terms described in <u>Exhibit A</u>, unless otherwise agreed between the parties. The parties acknowledge that contract terms are subject to negotiation of a contract with each customer in the Government Market.

6. <u>Warranties by CM ENERGIES</u>. CM ENERGIES warrants to PB&A and to any purchaser that the Systems shall conform to their applicable specifications, will be free of defects in design or workmanship, shall be merchantable and fit for their intended purpose, and that CM ENERGIES services shall be in conformance with professional standards in the industry. This warranty is in addition to any other warranty or guarantee that CM ENERGIES may make. This warranty shall continue throughout the term of this Agreement

36

and shall extend through the term of any customer contract. Each customer is an intended third party beneficiary of this warranty.

7. <u>Joint Submission of Proposals</u>. PB&A and CM ENERGIES agree to jointly submit proposals to prospects for opportunities identified by PB&A. PB&A shall be prime, and CM ENERGIES shall be subcontractor in all proposals for projects generally designed to demonstrate the capability of the CM Energies systems. These projects require five or less systems to be installed to demonstrate capability. CM Energies shall contract directly with the government to supply energy through long term, typically 20 year contracts to supply electricity where CM Energies and PB&A would be compensated through the sales of electricity by the kwh. Our goal is to sell and install enough units in a given geographical area, to make maintenance efficient. PB&A shall lead all proposals for the government. CM Energies shall support proposals to the government.

(a) The Prime proposal will identify Prime as the proposed prime contractor and Subcontractor the Subcontractors primarily responsible for the areas specified in Paragraph (c), below.

(b) Subcontractor will support Prime and the other Subcontractors during its proposal effort, specifically in the area(s) specified in Paragraph (c) below. Prime will provide Subcontractor, within two weeks after submittal of the proposal, a copy of those unclassified portions of the technical proposal submitted to the Government by Prime which embody the areas for which Subcontractor is responsible.

(c) The definition and scope of work to be performed by each of the parties is set forth in detail and contained in <u>Exhibit A</u> of this Agreement.

(d) If the Prime proposal results in Prime obtaining a prime contract award for the supply, installation, and/or maintenance of the Systems, (the *"Program"*), Prime will, subject to any consent required by the Government and unless the Government directs otherwise, offer a subcontract to Subcontractor in the areas specified in Exhibit A to be explicitly defined in a subcontract Statement of Work, to the extent such work and funding for it is included in the prime contract.

(e) Any subcontract shall be subject to the mutual agreement of Prime and Subcontractor relative to terms and conditions, including price and delivery schedule, except that it shall contain clauses required by the applicable Government procurement regulations and the prime contract. The parties hereto agree to negotiate in good faith to achieve such mutual agreement. If necessary to preserve schedule, Subcontractor shall accept a Letter Contract which shall contain all the aforementioned required provisions and shall be subject to further negotiation and definitization.

(f) CM ENERGIES agrees to submit to PB&A in support of its proposal, cost and pricing data including basis of estimates as required by the RFP or by law or regulation in sufficient detail to allow PB&A to negotiate subcontracts with CM ENERGIES and to submit and negotiate proposals with the Government. CM ENERGIES shall adhere to all of the requirements and certification of the RFP regarding accurate, current and complete pricing data. CM ENERGIES shall submit its price proposal to PB&A in sufficient time to allow PB&A to review the proposal and incorporate it into the cost proposal to the customer. In the event PB&A changes any portion of the proposal prepared by CM ENERGIES, such changes

will be submitted to CM ENERGIES for review and approval prior to incorporating the changes in the proposal.

(g) CM ENERGIES is familiar with, and will comply with, the requirements of subsection 27(a) of the Office of Federal Procurement Policy Act (41 U.S.C. 423) as implemented in the Federal Acquisition Regulation (FAR), and will report immediately to PB&A any information concerning a violation or possible violation of subsections 27(a), (b), (c), or (e) of such Act, as implemented in the FAR pertaining to this procurement; and will deliver an executed certification(s), in a form acceptable to PB&A, reflecting conformance with the matters specified above to PB&A upon PB&A's request.

(h) PB&A will have primary responsibility for the conduct of marketing activities related to the proposal, and CM ENERGIES agrees to provide such reasonable complementary marketing support as PB&A shall deem necessary and request. PB&A shall be the sole contact with potential customers concerning any contract or proposal. CM ENERGIES shall not make any presentation directly to the Customer or communicate with the Customer unless PB&A has approved the presentation in advance of making the presentation.

(i) PB&A and CM ENERGIES each will bear all their own expenses, costs, risks, and liabilities arising out of its respective proposal and marketing efforts, and any other efforts, performed under this Agreement and neither will make any claim or charges against the other, except to the extent that any of such shall be properly includable and allowable in its indirect cost allocation to contracts and subcontracts.

8. Exclusivity. CM ENERGIES shall not, during the term of this Agreement, associate or team with or provide proposal support, services or information to any third party regarding the sale of the Systems to the Government Market, except with the prior written consent of PB&A.

9. Confidential Information. During the course of this Agreement either party may exchange or disclose to the other information and data which it considers to be proprietary. In such event the disclosure and use of all proprietary data shall be in accordance with the Reciprocal Non-Disclosure Agreement dated 8 November 2010.

(a) Data jointly developed for the purpose of this proposal shall be the joint property of the parties and, except as otherwise provided for in this Paragraph (a) neither party, without the consent of the other, shall disclose or publicize such information or data for a period of three years (3) from the date of this Agreement. The foregoing restriction shall not, however, preclude the submission of information or data to the United States Government in support of proposals submitted under this Agreement, provided appropriate restrictive legends are utilized in connection with such disclosures.

(b) The obligations of Paragraph 9 shall survive any termination of this Agreement.

10. Inventions. Any invention jointly conceived or jointly first actually reduced to practice by employees of CM ENERGIES in the course of the the project shall be owned by CM ENERGIES. CM ENERGIES shall have the exclusive right to file a patent application thereon. Any invention conceived or first actually reduced to practice solely by employees of PB&A in the course of the project shall be owned by PB&A. These include patentable, unpatentable, and copyright adaptations to the appearance and functionality of the Systems. PB&A shall have the exclusive right to price and provide provide these adaptations and

services and to patent such inventions, where applicable. If such adaptations are desired by the government, PB&A shall be compensated for adaptations through direct pricing additions in proposals the government or agreed upon increase in compensation from CM ENERGIES above that stated in Exhibit A, Section 1.4.

(a) With respect to inventions conceived in the course of the project by employees of one party only, such party shall have the entire right, title and interest in such inventions and the exclusive right to file patent applications thereon in its own name, subject to a royalty-free, non-exclusive and irrevocable license (without the right to grant sublicenses) to make, have made, use and sell the invention granted to the other party for use only in the project contemplated by this Agreement and the performance of resultant contract(s) to the extent set forth in said contract(s).

11. Publicity. The parties will agree on a joint press release announcing their collaboration. No publicity or advertising shall otherwise be released by either Prime or Subcontractor in connection with this Agreement or any proposal contemplated hereby without the prior written approval of the other, such approval not to be unreasonably withheld or delayed. Neither party, however, shall be precluded from revealing to the Government the existence and contents of this Agreement. In the event of any contract award of the type contemplated by this Agreement, Subcontractor shall not make any releases for publication in media intended for public circulation without Prime's prior approval thereof. Any such public announcement, release or disclosure shall give due credit to the contributions of each party.

12. Relationship of Parties. Each party hereto shall act as an independent contractor, and this Agreement shall not constitute, create, give effect to or otherwise recognize a joint venture, pooling arrangement, partnership, or formal business organization of any kind. No relationship, other than that created by and set forth in this Agreement, shall be intended or established by any reference to the parties operating as a "Team" or as "Team Members."

13. Termination of a Proposal. The parties' obligations shall terminate with respect to any proposal submitted in the Government Market upon the happening of the earliest of any of the following:

(a) Notice from the Government that the prime contract for the relevant procurement will not be awarded to the PB&A/CM ENERGIES Team;

(b) Award of a subcontract by Prime to Subcontractor under a prime contract awarded to Prime in relevant procurement;

(c) Cancellation of the RFP for the procurement by the Government, or changes to the anticipated requirements of the contemplated RFP for the procurement to such an extent that the objectives of this Agreement are no longer practical for the procurement;

(d) Mutual agreement in writing of the parties hereto;

(e) Expiration of a period of eighteen (18) months from the effective date of the RFP;

(f) Failure of the parties to agree upon subcontract terms and conditions after negotiating in good faith for a reasonable time, upon the providing of five (5) days' advance written notice by one party to the other party;

39

(g) Failure of either party to perform any task as set forth in Exhibit "A" of this Agreement.

(h) Liquidation or bankruptcy of either Party.

14. Term. Unless earlier terminated as provided below, the initial term of this Agreement (the "Term") shall be five years, beginning on the Effective Date, and this Agreement may be renewed for additional terms of five years upon the mutual written agreement of the parties.

15. Termination.

(a) This Agreement shall terminate at the end of its term, including any renewal term.

(b) In addition to such other remedies as it may have, either party may terminate this agreement for breach by the other party of this Agreement or any contract or subcontract issued as a result of the parties' efforts under this Agreement, upon thirty (30) days notice and opportunity to cure. Suspension or debarment shall constitute a breach.

16. Survival. The parties' obligations with respect to confidentiality and intellectual property, and CM ENERGIES' indemnification obligations hereunder, shall survive termination of this Agreement. Termination of this Agreement shall not affect any claim or cause of action that has accrued prior to termination. Termination of this Agreement shall not terminate the parties' obligations under any contract or subcontract with a customer.

17. Entire Agreement. Other than confidentiality agreements executed between the parites prior to the execution of this Agreement, this Agreement and Exhibits contain the entire Agreement of the parties and supersedes any previous understanding, commitments or agreements, oral or written, with respect to the subject matter hereof.

18. Amendment. This Agreement may not be amended unless set forth in a document executed by duly authorized representatives of both parties. The failure of either party to insist upon performance of any provision of this Agreement, or to exercise any right, remedy or option provided herein, shall not be construed or deemed as a waiver of the right to assert any of the same at any time thereafter.

19. Waiver. No waiver of any right or provision of this Agreement shall be effective unless in writing and signed by the waiving party.

20. Severability. If any term, condition, or provision of this Agreement is held or finally determined to be void, invalid, illegal or unenforceable in any respect, in whole or in art, such term, condition or provision shall be severed from this Agreement, and the remaining terms and conditions shall continue in force and effect.

21. Assignment. Neither party may assign or transfer its interest hereunder without the prior written consent of the other, such consent shall not be unreasonably withheld. Any such assignment, novation or transfer by one party not in accordance with this provision shall be a material breach of this Agreement and shall be grounds for immediate termination thereof by the non-breaching party. This Agreement shall inure to the benefit of, and shall be binding upon, the parties' successors and assigns.

22. GOVERNING LAW. THIS AGREEMENT AND THE INTERPRETATION THEREOF SHALL BE GOVERNED BY THE LAWS OF THE STATE OF TEXAS. This Agreement will be interpreted and the rights of the parties construed in accordance with Texas law, and any litigation concerning this agreement shall be limited and confined exclusively to the appropriate state or federal court located within the state of Texas.

23. **Dispute Resolution.**

    (a) **Mediation; Arbitration.** The parties shall endeavor to settle all claims, controversies, or disputes arising out of or relating to this Agreement, including without limitation any claim, controversy, or dispute concerning any determination, negotiation, or agreement to be reached by the parties under this Agreement (hereinafter, the *"Dispute"*) by mediation. The parties shall bear the costs of the mediation equally.

    (b) **Breach of Confidentiality.** The parties acknowledge that the unauthorized disclosure of any information required to be kept confidential pursuant to this Agreement will give rise to immediate irreparable injury to the party that owns the information. Notwithstanding the Dispute Resolution provisions contained herein, each party may obtain immediate and injunctive relief against the breach or threatened breach by the other party of the covenants to keep such information confidential.

24. **Limitation of Liability.** EXCEPT FOR CM ENERGIES' INDEMNIFICATION OBLIGATIONS HEREUNDER, IN NO EVENT SHALL EITHER PARTY BE LIABLE FOR ANY SPECIAL, INCIDENTAL, INDIRECT, CONSEQUENTIAL, OR PUNITIVE DAMAGES EVEN IF ADVISED OF SUCH POTENTIAL LOSS OR DAMAGE.

25. **INDEMNITY BY CM ENERGIES.** CM ENERGIES shall indemnify, defend, and hold harmless PB&A, its shareholders, directors, employees, agents, representatives, successors and assigns (*"Indemnified Parties"*) for any and all claims, damages, suits, actions, judgments, liabilities, defaults, costs and expenses (including reasonable attorneys and experts fees and costs) arising under tort, contract, common law, breach of warranty, strict liability, statute, or other theory (*"Claims"*) asserted against or incurred against such Indemnified Party as a result of (a) any infringement by the System or its operation of any intellectual property right of any person; (b) any strict liability or products liability claim related to the System or its operation; (c) any failure of the System to perform as warranted or as specified in any contract; (d) any bodily injury, including death, and any property damage caused in whole or in part by any agent or representative of CM ENERGIES or its contractors or subcontractors; (e) any bodily injury, including death, and any property damage sustained by any employee, agent, or representative of CM ENERGIES or its contractors or subcontractors; (f) any breach of contract, and any misrepresentation or breach of warranty by CM ENERGIES.

(Signature page follows.)

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed effective as of the day and year above provided.

PB&A, Inc.

By: _Paul 2, Bechtel_

Name: _Paul Bechtel_

Title: _President_

Date: _23 August 2011_

Address for notice:
PB&A
700 Lavaca, Suite 607
Austin, Texas 78701

CM Alternative Energies, Inc.

By: _____

Name: _____

Title: _____

Date: _____

Address for notice:
CM ENERGIES
P.O. Box 5337
Jonestown, TX 78645

42

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed effective as of the day and year above provided.

PB&A, Inc.

By: _Paul L. Bechtel_

Name: _Paul Bechtel_

Title: _President_

Date: _23 August 2011_

Address for notice:
PB&A
700 Lavaca, Suite 607
Austin, Texas 78701

CM Alternative Energies, Inc.

By: _____

Name: CHARLIE MALOUFF

Title: CEO

Date: 23 Aug 2011

Address for notice:
CM ENERGIES
P.O. Box 5337
Jonestown, TX 78645

43

APPROVAL

## CM ENERGIES/PB&A TEAMING AGREEMENT

The attached Teaming Agreement, under which PB&A is a proposed team member and CM ENERGIES is a proposed team member for the Program, HAS BEEN REVIEWED AND APPROVED BY:

**PB&A, INC.**                              **CM ENERGIES**

_Paul L. Beutel_
_____                     _____
(Signature)                               (Signature)

_Paul Beutel / President PB&A_             **CHARLIE MALOUFF, CEO**
_____                     _____
(Name)                                    (Name)
(Title)                                   (Title)

_23 August 2011_                           **23 AUG 2011**
_____                     _____
(Date)                                    (Date)

## 1.0 INTRODUCTION

1.1    This document summarizes the effort to be accomplished by CM ENERGIES and PB&A, Inc. in support of PB&A'S Proposal for the Program. The purpose of this document is to supplement the Teaming Agreement and to serve as a guideline for the PB&A/CM ENERGIES working relationship.

1.2    It is intended that the CM ENERGIES effort following the award by the Government of the Program contract, and for performance during the Program contract should PB&A/CM ENERGIES Team receive the award, shall consist of :

Providing Materials and Labor for manufacturing, delivery, installation, and maintenance of the Systems, on price and terms to be negotiated in each contract with the government

1.3    It is intended that PB&A's primary effort shall be to provide marketing services for sales of CM ENERGIES systems to the government. PB&A shall provide engineering services and expertise. Payment for engineering services provided by PB&A shall not be recovered from a % of revenue from the sale of energy by the kwh noted in 1.4 below. Rather, PB&A shall be compensated for engineering services a separate payment item for demonstration projects for the government (typically requiring 1-5 systems). In proposals to the government for more than 5 systems, CM ENERGIES will compensate PB&A for engineering services required, to be negotiated with each project.

PB&A may receive other fees and markups pursuant to the prime contract negotiated between PB&A and its customer.

1.4    The parties anticipate that energy contracts will be awarded to install and operate five or more Systems to supply electricity for the Government Market customer, at a price per kilowatt hour to be determined by negotiation with the customer. CM ENERGIES will receive 95% and PB&A will receive 5% of all revenue received from supply of electricity by the kwh by CM ENERGIES.

The parties recognize that alternative revenue models will need to be negotiated for a pilot project and for projects with fewer than 25 units.

1.5    Contracts will address ownership of the Systems, as between the government, PB&A, and CM ENERGIES.

## 2.0 PROPOSAL EFFORT

PB&A and CM ENERGIES will work together in an effort to win opportunities identified by PB&A. The primary duties and responsibilities for each company during this period are outlined herein.

45

In pursuit of these, it is recognized that an exchange of ideas and information will be necessary for each party to meet respective responsibilities, and that several iterations may be necessary before arriving at satisfactory results.

## 2.1  PB&A RESPONSIBILITIES

2.1.1.  Proposal to Customer – PB&A will be responsible for preparation of the Proposal to be submitted to the Customer.

2.1.2.  Schedule – PB&A will prepare a master schedule which identifies the delivery dates for deliverable items to be delivered by CM ENERGIES during the contractual period.

2.1.3  Data Requirements List – PB&A will prepare a data requirements list identifying the documentation which must be delivered by Subcontractor during the contractual period.

2.1.5.  Statement of Work – PB&A will be responsible for preparing a Statement of Work (SOW) for the inclusion in a Request for Proposal (RFP) to CM ENERGIES if PB&A receives contract award. This SOW will cover the contractual period and will generally follow the guidelines outlined herein. To assist PB&A in this effort, CM ENERGIES will prepare a preliminary SOW covering the proposed activities of CM ENERGIES during the contractual period, and will submit such preliminary SOW to PB&A for review and approval.

2.1.6.  Purchase Specifications – PB&A will be responsible for preparing Purchasing Specifications, as required, for each deliverable item to be supplied by CM ENERGIES. These specifications will be included in the RFP package and will be for the items identified therein. CM ENERGIES will assist in this effort by supplying major technical inputs for the program, and other items, where appropriate.

## 2.2  CM ENERGIES RESPONSIBILITIES

2.2.1.  Preliminary Statement of Work - CM ENERGIES will prepare and submit to PB&A a technical approach covering its proposed activities during the contractual period.

2.2.2.  Schedule – CM ENERGIES will prepare and submit to PB&A a Schedule for its proposed contractual work effort in accordance with a master schedule to be supplied by PB&A.

2.2.3.  Management Plan - CM ENERGIES will prepare and submit to PB&A a management plan to cover its intended work effort during the Program contract.

2.2.4.  Design Description - CM ENERGIES will prepare and submit to PB&A preliminary descriptions for each of the hardware and software items which have been identified by PB&A as deliverable items, as well as any additional items which may be added later by mutual agreement. These descriptions should cover the physical, functional, interface, electrical, mechanical, reliability, safety and environmental characteristics of each item.

2.2.5.  Cost Estimates – CM ENERGIES will prepare and submit to PB&A cost estimates for its proposal items as required by the RFP, including the required basis of estimates to assist Prime in tradeoffs, program definition, and proposal preparation.

2.2.6.  Proposal Inputs – CM ENERGIES will prepare and submit to PB&A written inputs as may be necessary to support the preparation of the PB&A proposal in response to the Program RFP.

# APPROVAL

## CM ENERGIES/PB&A TEAMING AGREEMENT

The attached Teaming Agreement, under which PB&A is a proposed team member and CM ENERGIES is a proposed team member for the Program, HAS BEEN REVIEWED AND APPROVED BY:

| PB&A, INC. | CM ENERGIES |
|---|---|
| *Paul 2. Bewitt* | |
| (Signature) | (Signature) |
| *Paul Bewitel / President PB&A* | |
| (Name) | (Name) |
| (Title) | (Title) |
| *23 August 2011* | |
| (Date) | (Date) |

 **YAHOO! MAIL** Classic

## Re: Ellsworth AFB Wind Energy

Thank you.

P

Sent from my Verizon Wireless BlackBerry

---

**From:** cmenergies@yahoo.com
**Date:** Thu, 26 May 2011 12:20:58 +0000
**To:** Paul Bechtel<pbechtel@bechtel-s.com>
**ReplyTo:** cmenergies@yahoo.com
**Subject:** Re: Ellsworth AFB Wind Energy

Paul. On the road to NM. Sporadic phone and email

1. Faa: we are less than 200 feet. We can be as close as 225ft perpendicular to xenter of runway. We are in taylor and have had no complaints in 4 mo at 1125 feet from airportm

2. Batteries will be designed to accomodate "back up" needs, ie, 3hr. 4hr. Etc..

3. We just weathewred 2 SEVERE storms. We ground the tower. The inverters have not blown. So far I say no problem. That is what insurance and s and m is for.

Sent from my BlackBerry® smartphone with Nextel Direct Connect

---

**From:** "Paul Bechtel" <pbechtel@bechtel-s.com>
**Date:** Thu, 26 May 2011 07:17:21 -0500
**To:** <cmenergies@yahoo.com>
**Cc:** Steven Winton<swinton@bechtel-s.com>
**Subject:** Ellsworth AFB Wind Energy

Charlie: I have a few questions from Ellsworth. Can you answer any of these ?

- Radar – what is our vertical limit based on FAA requirements ?

- How long will the batteries run to provide power in no wind scenario?
- Will lightning strikes affect the electronics ?

Thank you.

Will have something to you this week yet on cost.

Paul B

4a

# PROGRAM ANNOUNCEMENT FOR FY 2012 ENVIRONMENTAL SECURITY TECHNOLOGY CERTIFICATION PROGRAM (ESTCP)— INSTALLATION ENERGY

## BAA Proposal Submission Instructions

(Reference: BAA February 1, 2011, U.S. Army Corps of Engineers Humphreys Engineering Center Support Activity)

## 1.  INTRODUCTION

The Environmental Security Technology Certification Program (ESTCP) is the Department of Defense's (DoD) demonstration and validation (Dem/Val) program for environmental and energy technologies. ESTCP is soliciting proposals for demonstrations of energy technologies on DoD installations as candidates for funding beginning in Fiscal Year (FY) 2012. All proposals must respond to one of the topic areas described in Section 2 of this document. Technologies appropriate for demonstration and validation will be sufficiently mature that all required laboratory or other proof-of-principle work has been completed. Mature commercial technologies already in use are not considered appropriate for demonstration and validation.

**This Broad Agency Announcement (BAA) is for Private Sector organizations.** DoD organizations (Services and Defense Agencies) wishing to submit proposals to ESTCP should refer to the DoD Call for Proposals (CFP). Other Federal agencies (non-DoD) should refer to the Non-DoD Federal Call for Proposals. Details may be found on the ESTCP web site www.serdp-estcp.org/Funding-Opportunities/ESTCP-Solicitations/Installation-Energy-Solicitation.

## 1.1  BACKGROUND

The purpose of ESTCP Installation Energy technology demonstrations is to accelerate the deployment of innovative energy technologies that target DoD needs. ESTCP demonstrations are conducted under operational conditions at DoD installations. The demonstrations are intended to generate supporting cost and performance data needed for validation of the technology. The goal is to enable promising technologies to receive end user acceptance and be fielded and commercialized more rapidly. To achieve this goal, ESTCP projects create a partnership between technology developers and DoD installations. This program announcement is seeking proposals from the technology development community.

The Department of Defense (DoD) spends approximately $4 billion per year on facility energy consumption to power and fuel over 500 military installations worldwide. These installations include over 500,000 buildings and structures as well as 160,000 non-tactical vehicles.

The Department has three key installation energy goals:
- Reduce energy usage and intensity
- Increase renewable onsite energy generation and
- Improve energy security

For details on DoD's energy management goals and status, see the DoD Strategic Sustainability Performance Plan at www.acq.osd.mil/ie/download/green_energy/dod_sustainability/DoD%20SSPP-PUBLIC-26Aug10.pdf.

To achieve these goals cost effectively will require the increased deployment of advanced technologies. ESTCP energy demonstrations are designed to meet these goals. Demonstrations of energy technologies on military installations should accelerate the broader deployment of the innovative energy technologies across DoD by reducing real and perceived risks. Newly developed pre-commercial and emerging commercial technologies are of interest.

## 1.2    REQUIREMENTS OF AN ESTCP PROJECT

ESTCP Installation Energy projects must:

1. Execute the technology demonstration to validate the technology's performance and expected operational costs:
   - Each project develops a demonstration plan to govern the technical execution and management of the demonstration. Guidance describing the requirements of the ESTCP Demonstration Plan can be found at www.serdp-estcp.org/Investigator-Resources/ESTCP-Resources/Demonstration-Plans. The demonstration plan is reviewed and must be approved by the ESTCP Office prior to beginning any fieldwork.
   - Each project is expected to generate sufficient pertinent and high quality data to scientifically prove the validity of all claims made for the technology.
   - Cost and performance data will be collected during the demonstration(s) to allow realistic estimates to be derived for full scale implementation of the technology at the demonstration site and other DoD sites.
2. Transfer the technology:
   - Identify and work with the intended DoD user community to achieve their acceptance and feedback on the usefulness of the technology.
   - Publish, as necessary, appropriate guidance, design, and/or protocol documents to assist the future implementation of the technology.
   - Publish a final report based on the ESTCP Final Report guidance at www.serdp-estcp.org/Investigator-Resources/ESTCP-Resources/Technical-Reports.
   - Provide a draft cost and performance report for publication by ESTCP based on the ESTCP Cost and Performance Report guidance at www.serdp-estcp.org/Investigator-Resources/ESTCP-Resources/Technical-Reports.
   - Publish the results of the demonstration, when appropriate, in the scientific peer reviewed literature. Present results, as appropriate, at technical conferences.

Technologies selected for demonstration will be teamed with a DoD partner, who will be responsible for assisting in selecting the demonstration site, validating the technology's cost and performance, interfacing with the user community, and supporting the transfer of the technology across DoD. Proposals with identified military installations willing to serve as the test site are encouraged but not required.

51                                   BAA Proposal Submission Instructions

## 1.3 GENERAL INFORMATION FOR PRIVATE SECTOR PROPOSERS

Awardees under this BAA will be selected through a multi-stage review process, including a brief pre-proposal, a full proposal, and an oral presentation. Based upon the pre-proposal evaluation by the Government, each of the pre-proposal submitters will be notified as to whether the Government requests or does not request the submission of a full proposal. Those submitters who are invited to submit full proposals, but who do not have a DoD partner or a DoD demonstration site, will be assigned a liaison to assist in the identification of an appropriate demonstration site. Each full proposal submitter will be asked to make an oral presentation to the ESTCP Technical Committee. The costs associated with this initial, pre-award presentation shall not be included in the proposal cost estimate. This cost is borne by the proposer.

Based on evaluation of the written proposal and oral presentation, each full proposal submitter will be notified as to whether the Government wishes to enter into negotiation for the award of a contract. Offerors are advised that only the Contracting Officer is legally authorized to commit the Government. ESTCP reserves the right to select for award any, all, or none of the proposals received. ESTCP also reserves the right to select a portion of the work proposed in any single proposal for award. There is no commitment by ESTCP to make any contract awards, nor to be responsible for any money expended by the offeror before contract award is made for a demonstration. Due to the volume of pre-proposals received, the Government will not provide debriefs on those that are not requested to submit a full proposal.

The solicitation will be managed by the ESTCP Office along with the U.S. Army Corps of Engineers' Humphries Engineering Center Support Activity (HECSA) at Fort Belvoir, Virginia. For contractual information, please contact Ms. Susan Hill at HECSA 703-428-6420 or by e-mail at Susan.M.Hill@usace.army.mil. Procedural questions may be referred to Ms. Jina Banks-Saunders in the ESTCP Office at 703-696-2127. For technical questions regarding this announcement, contact Dr. Jim Galvin at James.Galvin@osd.mil, or by telephone at 703-696-2121.

## 1.4 EVALUATION SCHEDULE

### Table 1. ESTCP Project Selection Schedule

| DATE | ACTIVITY |
|---|---|
| February 1, 2011 | BAA / Call for Pre-Proposals Released |
| March 24, 2011; 4 pm Eastern Time | **Pre-proposals Due to ESTCP Office** |
| Late June 2011 | Request Full Proposals |
| August 18, 2011; 4 pm Eastern Time | **Full Proposals Due to ESTCP Office** |
| Mid to Late September 2011 | Briefings Before ESTCP Technical Committee |
| October 2011 | Project Selection |
| March 2012 | Award of Contracts / Project Initiation |

# 2. DESCRIPTION OF PROPOSALS SOUGHT

Candidate technologies suitable for demonstration on DoD installations are sought in the following topic areas:

1. **Smart Micro-grids and Energy Storage to Increase Energy Security on DoD Installations**: Demonstration projects are sought for cost effective technologies to enable the design, development, implementation and management of micro-grids on Department of Defense (DoD) installations to meet DoD energy goals. Desired energy security improvements and cost reductions occur through increased efficiency and control of the use and management of energy generated and stored on DoD installations. Micro-grid applications may occur at the building level, installation level, or across a region of DoD activities. The DoD seeks proposals that demonstrate innovative technologies or new combinations of technologies to meet energy security goals by increasing the usage of micro-grids and energy storage.

2. **Renewable Energy Generation on DoD Installations:** Demonstration projects are sought for cost effective technologies to increase renewable energy generation on DoD installations to meet DoD energy goals. Desired energy security increases occur through assured access to reliable sources of base load and intermittent energy generated on DoD installations. The DoD seeks proposals that demonstrate innovative but technically mature technologies to meet energy security goals by increasing the amount of renewable energy generated on installations. Technologies of interest include, but are not restricted to: Geothermal, Waste to Energy, Biomass, and Solar. Renewable energy generation projects that leverage private third party financing are of particular interest.

3. **Advanced Component Technologies to Improve Building Energy Efficiency:** Demonstration projects are sought for cost effective component technologies to increase energy efficiency in DoD buildings to meet DoD energy goals. Energy reductions will occur through increased efficiency in both retrofit and new construction by exploiting emerging component technologies. The DoD seeks proposals that demonstrate innovative but technically mature technologies. Proposed technology demonstration should explicitly identify the need and value of conducting the demonstrations on a facility. Technologies of interest include, but are not restricted to: Heating, Ventilation and Air Conditioning, Windows, Roof Systems, Building Envelopes, Lighting, and Waste Heat Recovery (for heating or cooling). Integrated demonstrations of combinations of technologies are also of interest.

4. **Advanced Building Energy Management and Control:** Advanced building controls play a significant role in improving building energy performance. Desired energy cost reductions occur through increased efficiency in commissioning, diagnostics, and operations. The DoD seeks proposals that demonstrate innovative technologies or combinations of technologies to meet energy goals by increasing the performance of DoD buildings.

4

BAA Proposal Submission Instructions

5. **Tools and Processes for Design, Assessment and Decision-making Associated with Energy Use and Management**: Demonstration projects are sought for cost effective technologies to enable building managers, facility managers, regional managers and/or DoD portfolio managers the ability to improve decision making related to energy usage and investments. Advances are needed both in the design of new buildings and in the identification and design of major retrofits. Desired energy cost reductions occur through improved understanding of energy usage, energy needs, and opportunities. Managers often lack adequate information and analytic tools to make optimal decisions. The DoD seeks proposals that demonstrate innovative technologies to meet energy goals by increasing the performance of decision makers at all levels of the energy usage and management system.

Mature technologies with well established operational cost and performance criteria are generally not appropriate for ESTCP. Standard commercially available approaches currently deployed in the United States will likely be too mature.

Proposed technologies and methods should have completed all proof-of-principle work. Specific DoD site(s) may be suggested in the pre-proposal but are not required to be identified until submittal of the full proposal. ESTCP supports demonstration at a scale sufficient to determine the life-cycle operational cost and performance of the technology and its potential contribution to DoD energy security.

# 3. PRE-PROPOSAL INSTRUCTIONS

To be eligible for consideration, readers wishing to respond to this announcement must submit a pre-proposal. Any pre-proposal submitted shall be in response to only one of the topic areas set forth in Section 2 of this document. The pre-proposal must concisely describe the technology, including its level of development or maturity, and its cost/benefit. Specific DoD site(s) may be suggested in the pre-proposal but are not required.

## 3.1 COVER PAGE

Each pre-proposal must include a completed ESTCP cover page prepared via the web site at https://sems.serdp-estcp.org. As you make entries in the cover page, you may save data that has been entered or submit a completed cover page. When the cover page has been submitted, a pre-proposal number will be generated and you will receive on-line confirmation. From the "My Cover Pages" screen, click "view" to review, print, and sign your cover page **for inclusion as the first page** of the electronic proposal.

**Pre-proposals lacking this cover page or with an unsigned cover page will be considered nonresponsive.** A cover letter beyond this cover page is neither required nor desired.

## 3.2 PRE-PROPOSAL LENGTH AND STYLE

Pre-proposals should be no longer than five (5) pages, single-sided, and type face not less than 11 point. All margins (top, bottom, left, and right) should not be less than 1 inch. A one page curriculum vitae is required for each of the principal performers. One attachment of up to three single-sided pages of supporting data may also be submitted. The cover page, curricula vitae, literature references, and supporting data are not included in the 5 page limit.

## 3.3 PRE-PROPOSAL CONTENT

The pre-proposal must contain the following information:

1. Short Descriptive Title

2. ESTCP Topic Area: Each proposal must list the topic area title as described in Section 2:
   1) **Smart Micro-grids and Energy Storage to Increase Energy Security on DoD Installations;**
   2) **Renewable Energy Generation on DoD Installations;**
   3) **Advanced Component Technologies to Improve Building Energy Efficiency;**
   4) **Advanced Building Energy Management and Control; or**
   5) **Tools and Processes for Design, Assessment and Decision-making Associated with Energy Use and Management**

3. Lead Organization: Project lead, organization, address, telephone number, fax number, and e-mail address.

4.  Problem Statement: Clearly state the problem the technology demonstration is addressing and its relevance and importance to DoD. Identify the current approach (if one exists) for this problem and discuss its shortcomings.

5.  Technology Description: The technology description should include the following information:

    a)  *Technical Objectives.* Briefly state the objective of the proposed effort.

    b)  *Technology Description.* Describe the technology in sufficient detail to provide an accurate and factual understanding of its theory, functionality, and operation. If appropriate, provide an overall schematic of the technology. Discuss how the technology is innovative.

    c)  *Technology Maturity.* Provide evidence the technology is mature enough for demonstration (include references and funding history). Discuss any development or design work that is required prior to demonstration.

    d)  *Technical Approach.* Provide a broad overview of the experimental design of the demonstration proposed for evaluating the technology. Discuss the major elements of the demonstration and identify the key aspects of the overall approach as they relate to the evaluation of the technology. Include a brief description of a proposed site(s), if known, or the desired site characteristics. Discuss the scale of the proposed tests and any design work that will be required prior to demonstration. Identify specific technical or performance objectives to be validated. Identify methods for measuring and assessing the performance and expected operational costs of the technology. Describe criteria for success of the demonstration and the technology. Describe the technical approach in terms of tasks to be accomplished.

    e)  *Technical Risks.* Identify potential issues of concern and technical risks in taking the technology from the research phase to the proposed scale of the demonstration. Identify any assumptions that have been made that, if not realized, could impact the success of the project. Discuss how risks will be managed. If the demonstration is not at full scale, discuss any scale-up issues that will remain at the conclusion of a successful demonstration.

    f)  *Related Efforts.* Provide information on any relationship to other similar projects. Identify funding sources for these efforts.

6.  Expected DoD Benefit: Describe the expected benefit in terms of energy security, energy savings, and/or reduced cost. Assess the benefit per site or implementation. Provide realistic projections of the number of DoD sites or facilities where the technology could be deployed. Discuss how the information obtained from the demonstration will enable adoption of the technology throughout DoD. Estimate the expected return on investment and the time for payback. Discuss the life cycle cost advantages over current approaches.

7.  Schedule of Milestones: Provide a project schedule with expected milestones and deliverables for duration of the project in the form of a Gantt chart. Ensure that all required deliverables are included in the Gantt chart. Required deliverables are found in the reporting guidelines at www.serdp-estcp.org/Investigator-Resources/ESTCP-Resources.

8.  Technology Transition: Describe the method by which the technology will be transitioned to end user(s) or commercialized. Specify how technology transfer methods will differ to reach appropriate audiences (i.e., energy managers, consultants, etc).

Describe any proposed guidance, design, and/or protocol documents that will assist in future implementation. Explicitly identify potential first DoD users and follow-on implementation. If there are known institutional or regulatory barriers that effect the transition, they should be described in this section along with recommendations for addressing these barriers.

9. Performers: List the name and organization of the lead person(s) for each organization involved in the proposed demonstration and their expected contributions. Provide a one page curriculum vitae for each of the performers (not included in the five page pre-proposal count).

10. Funding: State the level of requested funding per year for the duration of the project, including any design work. Identify costs for any major equipment to be purchased. Although identification of a specific demonstration site is not required for pre-proposals, include an estimate for the cost for a representative field demonstration of the technology. Ensure adequate funds are requested to meet all reporting and travel requirements. ESTCP reporting requirements are available at www.serdp-estcp.org/Investigator-Resources/ESTCP-Resources. List other sources of expected funding to support the demonstration and leveraged resources. Provide a Point of Contact (POC) and telephone number for each leveraged resource listed.

# 4. SUBMITTAL INSTRUCTIONS

Your proposal will be considered officially submitted upon the on-line submission of a PDF of your complete proposal package via WebPTS. No hard copies are required. **Pre-proposals must be submitted prior to 4:00 PM Eastern Time on March 24, 2011.**

**\*\*NEW\*\* Electronic Proposals are now uploaded through WebPTS.** Once your proposal has been finalized, create a single PDF that contains all required sections. Make sure to insert the **signed and scanned cover page as the first page of the PDF.** You are now ready to upload your proposal to the web site.

- Log in to SEMS at https://sems.serdp-estcp.org and go to the WebPTS Tab.
- Follow the on-screen instructions. You must SUBMIT your cover page before the proposal upload function will be activated.

Once your proposal has been uploaded you will receive an on-line confirmation message.

NOTE: Instructions for creating your Cover Page can be found in Section 3.1.

You may continue to modify your cover page and upload revisions to your proposal until the due date. Should you need to re-upload a proposal or revise your cover page, select "Edit" and follow the instructions. Make sure any changes to the cover page are made first. Prior versions of your proposal will be overwritten and only the last version uploaded will remain in the system.

For WebPTS or Proposal Upload questions contact Amy Kelly at Amy.Kelly.ctr@osd.mil or by telephone at 910-579-8052, or the ESTCP Office at 703-696-2127.

## 5.   FULL PROPOSAL

After evaluation of the pre-proposals, ESTCP will contact all submitters and either request or not request each to submit a full proposal. At that time, detailed instructions will be provided for the full proposal format. If necessary, ESTCP will coordinate and schedule a partnering meeting with an appropriate DoD partner to provide input for the full proposal including, but not limited to, selection of a DoD demonstration site. Full proposals may not be submitted outside the pre-proposal process. Any full proposal that has not been reviewed in the pre-proposal phase will not be evaluated nor considered for award under this BAA.

# 6. EVALUATION FACTORS FOR PRE-PROPOSALS AND FULL PROPOSALS

The following evaluation factors will be the sole basis for reviewing pre-proposals and full proposals submitted in response to this BAA. Relevance and technology maturity are pass/fail criteria: proposals not passing these gates will not be further evaluated. Among the evaluation factors, Technical Merit is most important, followed by Cost/Benefit, Transition Potential, and Cost. Small Business Participation will be a factor for the full proposal only and will be smaller than Cost.

## RELEVANCE
An assessment will be made whether the submission responds to the DoD requirement as described in Section 2.

## TECHNICAL MATURITY
An assessment will be made of the appropriateness of the proposed technology for demonstration and validation. Proposed technologies should have completed required proof-of-concept work and have evidence of the technology's capabilities. Technologies should be mature enough that within one year of project initiation any required design work will be completed and a field ready application can be deployed for testing. Standard commercially available technology or approaches currently deployed at DoD sites will be considered too mature. ESTCP will not consider project submissions that fall in the categories of basic research (scientific foundation) or exploratory development (bench scale applied research).

## TECHNICAL MERIT
An assessment of the technical merit of the proposal will be made. Factors to be considered include: (a) the methodology is scientifically sound; (b) the technology is innovative and is the current state-of-the-art; (c) the technical risks are well characterized; and (d) the technical team is qualified to execute the proposed project.

## COST/BENEFIT OF TECHNOLOGY
An assessment as to the cost/benefit of the proposed technology, if it were deployed, will be made. Factors to be considered include: (a) the projected cost savings and/or risk reduction are significant; (b) the projected benefits are reasonable and consistent with the proposed technology; and (c) the payoffs from the proposed technology are commensurate with the projected costs and risks.

## TRANSITION POTENTIAL
An assessment as to the potential for a successful transfer of the technology to the DoD user will be made. Factors to be considered include: (a) there is a well defined DoD user for the technology; (b) there are clearly identified activities that will support and enhance the transfer of the technology; and (c) the technology can be implemented within DoD.

## COST OF PROPOSAL

An assessment as to the reasonableness of the proposed cost will be made. Costs should be appropriate and traceable to the level of effort required to execute the project.

## SMALL BUSINESS PARTICIPATION

The government goal is that small business participation represents 5 percent of the total contract value. The government encourages offerors to propose a goal of 5 percent or greater small business participation. The overall goal accomplishment shall be met through collective small business participation from any type of small business or sub-category small business. Large and small business will be evaluated on the basis of: (a) the extent to which small business firms are specifically identified in proposals; (b) the complexity and variety of the work small firms are to perform; (c) the extent of participation of small business firms in terms of the value of the total acquisition and the extent of which the proposals meet or exceed the small business 5 percent participation goal for this acquisition. Along with applicable qualifications, capabilities, demonstrated achievements, and proposed commitment to the project by the small business, these items will be examined and assessed when full proposals are evaluated.

  

**PB&A, Inc.** is an engineering and environmental services company performing work for DoD, US Army Corps of Engineers, AFCEE and industry.

Our staff is responsive, flexible, and ready to deliver the product, approach, or solution to meet our client's most pressing needs. **Our responsiveness is what sets us apart.**

# Engineering Services

Our **engineering services** include design of soil, water and groundwater remediation projects, landfills, site-work, water/wastewater projects and general construction oversight. We have completed successful projects from Central America to Africa.

# Environmental Services

We offer a complete set of **environmental services** including environmental restoration, compliance and planning, permitting, military munitions response program support and groundwater resources. We've spent our careers simplifying the ·complexity of environmental regulations and developing close working relationships with regulatory agencies.

# Management and Professional Services

Our management and professional services include quality assurance and oversight of Restoration, Compliance and Military Munitions Response Programs for DoD. We also provide IT support, staff augmentation, classified services, and paper to website systems.

Services
Overview
Company
Experience
Services
Home

©2011 PB&A, Inc. All Rights Reserved.

Company

Experience

Services

Home



# Projects

We help wherever and whenever we can. We have proven that we can handle unique situations and challenges. By serving in our clients best interests and being open to all ideas, we have a surprisingly ability to get things done.

## Civil Engineering Design

- Design of water supply, landfill facilities, and wastewater systems for several Honduran cities.
- Design of an industrial landfill cover and a municipal landfill

## Water Resources

- Water resources assessment (dams, pump stations, treatment, and storage) for several Honduran cities
- Development of groundwater resources in southern and eastern Africa using radioisotope techniques

## Design and Construction Management

- Landfill upgrade at a DoD installation
- Buildings/structures including an entomology (pesticide) management building and a physics laboratory

## Environmental Services

- Risk based corrective action assessments for several installations
- Preliminary assessment/site investigation for one oil company and several DoD facilities
- Environmental management planning for several DoD facilities
- Spill prevention, control and countermeasures planning for a DoD installation
- RCRA compliance plans and reporting for several DoD facilities
- Natural and cultural resource planning for a 300-acre wetlands
- Solid waste management planning for a landfill
- Environmental assessments as per NEPA for DoD installations including Phase 1 Site Assessments and Environmental Baseline Surveys
- Pollution prevention planning for a landfill and a DoD installation
- Air, water, solid waste and RCRA permitting and compliance support for DoD and commercial clients

## Air Compliance Services

- Air emission inventories for one DoD installation with 180 sources
- Air quality program management including a Title V Permit Application and a Risk Management Plan for a DoD installation

## Data Management

- Development of individualized and flexible compact disc and web-based data storage and access systems for several DoD facilities

## Water and Wastewater

- Technology selection for oil removal and wastewater treatment systems for two refineries
- Process and detailed design of a 3,000-gpm activated carbon treatment system for well water in California
- Operations troubleshooting of an existing dissolved air flotation system and upgrading the design for a return to refinery wastewater service
- Operations auditing, benchmarking and optimization of treatment process operation for refineries, petrochemical and chemical plants
- Operator training at a major coal-fired electric generating station
- Permitting for numerous poultry production, refinery, petrochemical and commercial facilities

## Innovative Technology Applications

- Installation of an iron filing reactive wall at a depth of 80 feet to remove TCE and PCE from groundwater
- Removal of VOCs from well water using an in-well stripping and recirculation system to reduce a TCE/PCE "hot spot" to drinking water MCL
- Development of an Internet web page for DOE linking internal and external sources of information on coal combustion byproducts (CCBs). Research was also conducted on the reuse and disposal of CCBs from emerging technologies.
- Monitoring of natural attenuation at spill sites and former landfills. Progress in natural attenuation at the spill sites became an element of the groundwater cleanup plan.
- Regional Project Advisor for the IAEA groundwater resources project in southern and eastern Africa. Provided technical support for the use of radioactive isotopes to quantify yield from groundwater sources and to trace contaminant movement in groundwater.
- Initial design and pilot plan for the application of carbon nanotube mesh for removal of Cryptosporidium, Giardia and other microbiological contaminants from potable water to meet LT2 rule compliance

**Experience**
**Projects**

**Clients**

Company

Experience

Services

Home

©2011 PB&A, Inc. All Rights Reserved.

Company
Experience
Services
Home



# Clients

Clients choose us because we provide personalized service while meeting the high demands of critical assignments. We demonstrate that complex issues can be simplified and that client service is the most rewarding aspect of our careers.

**Air Combat Command** operates fighter, bomber, reconnaissance, battle-management, and electronic- combat aircraft. It also provides command, control, communications and intelligence systems, and conducts global information operations.

The **Air Force Center for Environmental Excellence** provides Air Force leaders with the comprehensive expertise and professional services necessary to protect, preserve, restore, develop, and sustain the Nation's environmental and installation resources.

**Air Mobility Command** is a major command with headquarters at Scott Air Force Base, Illinois. AMC provides America's Global Reach. This rapid, flexible and

65

responsive air mobility promotes stability in regions by keeping America's capability and character highly visible.



The **International Atomic Energy Agency** is the world's center of cooperation in the nuclear field. It was founded in 1957 by the United Nations. The Agency works with its Member States and multiple partners worldwide to promote safe, secure and peaceful nuclear technologies.

The **United States Army Corps of Engineers** serves the Armed Forces and the Nation by providing vital engineering services and capabilities across the full spectrum of operations in support of national interests. We have served clients in the Fort Worth, Kansas City, Omaha, Tulsa, and Savannah Districts.

**Experience**
**Projects**
**Clients**
**Company**
**Experience**
**Services**
**Home**

©2011 PB&A, Inc. All Rights Reserved.

**Company**
**Experience**
**Services**
**Home**





# About Us

We opened our first office in Austin in February 2000 and have expanded to regional offices in Omaha and Atlanta. We were founded by industry-leaders who wanted a work environment with no barriers to excellence. With none of the typical corporate hierarchy or shareholders, we are accountable only to our clients and each other. We believe a company dedicated to client service provides our clients and our employees with the broadest range of opportunity.

**Company**
**About**
**Careers**
**Contact**

Company
Experience
Services
Home
©2011 PB&A, Inc. All Rights Reserved.

Company

Experience

Services

Home

  

# Contact

Email: **contact@pbainc.com**[Turn on JavaScript to see the email address]

## Corporate Headquarters

700 Lavaca Street, Suite 607
Austin, Texas 78701

+1 512 326 3223
+1 801 659 6270 (Fax)



## Regional Offices

## Omaha, Nebraska

907 Shady Tree Lane
Papillion, NE 68046

+1 402 339 0006
+1 501 629 4333 (Fax)

## Atlanta, Georgia

3096 Canter Way
Duluth, GA 30097

+1 770 497 8944
+1 770 497 4424 (Fax)

Company

61

# WIND ENERGY EVALUATION
## ELLSWORTH AIR FORCE BASE

July 5, 2011

Bechtel-S Corporation (Bechtel-S) is proposing to install a vertical wind generator with the capability of a maximum of 100 kilowatt (kW) of electrical output at Ellsworth Air Force Base (Ellsworth AFB) outside of Rapid City, South Dakota. The wind generator will be located at a strategic location on base to demonstrate the efficacy of this technology in reducing base dependence on outside energy sources. The South Dakota Wind Resources Map (www.windpowering America.gov) indicates that the area around Ellsworth AFB has wind resources that rate in the good to excellent category. Thus, the proposed installation has a high potential for providing electric power reliable over the course of the proposed 18 month demonstration program.

The exploitation of wind energy resources has three primary benefits that can be realized by Ellsworth AFB:

- Every kilowatt hour (kWh) of power generated by a wind energy system will potentially reduce the purchase of more expensive power,
- Every wind energy unit installed will lower the electric rate for the power receiveed, and
- If power from a wind energy unit is supplied behind a facility electric meter, during facility idle periods, the power generated can be potentially be sold to the electric utility if the existing power purchase agreement allows this transaction.

Thus, the development of a base-wide wind energy system can significantly lower the cost of energy in multiple ways.

The wind generator technology proposed for this project is manufactured by CM Energies, a Texas company that has developed their proprietary technical approach and design from the ground up. CM Energies offers units that have maximum generating capacities of 50 and 100 kW. The units are designed with a relatively small foot print (~50 feet by 50 feet) and heights (60 feet maximum) and as such can be strategically located adjacent to the point of use of the electric power. The unit output can be connected to the utility grid when allowed by agreement or provide power behind the electric meter to offset a portion of a facilities power demand. The relative simplicity of the unit allows installations in remote locations to operate with only minimal monitoring and maintenance by a trained technician. Thus, the proposed demonstration program will provide a basis for base-wide application and offset of a portion of the electric energy demand of the base.

When considering a wind-based energy program, it is important to visualize a complete program to truly be able to determine the advantages of the system. To date the only power consumption data for Ellsworth AFB found on the internet was a December 2008, Basin Electric Power Cooperative, Amended Renewable Objective Report which showed that the base consumed 6,057 megawatt hours (mWh) over a three month period. This power consumption rate averages approximately 2,100 MWh per month of electric energy usage. The amount of power derived from a wind energy is greatly affected by the availability of wind, wind speed and the number of units that can be applied in a given region. Based upon the power consumption figures for

1

Ellsworth AFB, a wind energy program could be implemented as described in the following sections.

First a wind energy program such as that offered by the Bechtel-S/CM Energies Team cannot practically supply a major portion of the energy requirements for Ellsworth AFB due to the number of units required. However, at base facilities where power demand is constant, the 100 kW units offered can offset a significant portion of the most expensive purchased power cost. For example, a fully developed wind energy program at the base may consist of 50, 100 kW units producing a maximum of 5 mW of energy. With a program of this magnitude, a full team of trained operations and maintenance staff can be dedicated to the base wind energy units. Costs for the labor, maintenance materials and capital amortization can be distributed over the 50 units thus resulting in a low power rate. See attached bar chart of the number of wind energy units versus the electic rate for the power generated. For example, if 50, 100 kW units were purchased and installed and reimbursement was handled through a long-term (10 years minimum) energy supply agreement with the option to renew for an additional 10 years with a rate adjustment. With this contract agreement, power would be supplied at $0.09 per kWh. Ellsworth AFB would only be charged for the power generated by the units. If Ellsworth AFB paid for the $13 million capital cost for the units and upgrading of the Base electrical system to accommodate the units, then the electric rate would drop to 5.5 cents per kWh. Thus, the cost savings from onsite generation and offsite power purchase would be significantly offset. Unfortunately, these types of power costs cannot be demonstrated in a single unit demonstration program.

An 18-month evaluation program can fully demonstrate the capability of a 100 kW wind energy unit in supplying the needs of a Base facility that has a continuous power demand. The unit can be configured to supply the energy behind the facility electric meter or to feed the energy into the Base grid. The approach to unit connection will depend on the desires of the Ellsworth AFB staff and the energy purchase agreement with the currently energy supplier. The basis for the cost estimate is summarized below:

- The unit will be manned by two full-time operator/maintenance men who will handle all routine maintenance and operation functions for the unit. In a larger facility these same two operators would be used to provide routine operations and maintenance for 10 wind energy units. The labor costs for the demonstration will be disproportionately high.
- Since this will be the first installation of a CM Energies unit in heavy snowfall location, additional maintenance costs will be incurred if the unit must be disassembled during the demonstration period. An emergency maintenance contingency for the units is estimated at one episode per operating year. For the purposes of the project and the unknowns for the unit in cold weather, a total of 4 maintenance episodes have been estimated.
- There are travel costs associated with this demonstration project due to the distance from the home area of the companies supplying the equipment, operations and maintenance services and project support.
- The capital cost for the unit has been amortized over the 18 month period of the project which is higher than normal. It is estimated that the operating life of the unit is 20 years with a sail replacement at 10 years. Thus, for this project, the amortization rate is over 10 times greater than would normally be expected., and

2

69

- This demonstration project requires project support which includes project management, data evaluation, reporting and administrative support which would not normally be included in the installation of a wind energy unit. Most of these project support costs would not normally be required in a wind energy unit installation.

The cost of the 18 month demonstration program including all the costs listed above is as follows:

**Total Project Cost -** **$1,340,000**

This cost should be viewed as a first step in realizing the benefits of a full wind energy program that will eventually lower the electric rate and potentially allow additional revenues to be generated through power sales if the existing power purchase agreement allows.

# ELLSWORTH AFB
## ELECTRIC RATES FOR A SINGLE, 100kW WIND ENERGY UNIT

**Electric Rate Calculations based on Capital and Maintenance Costs**

Assume: 1 wind energy units producing 100 kW for a maximum generation capacity of 0.1 mW

Assume a rate of 0.09 per kWh on a 10 year contract for power - pay for power generated

Maximum energy output = $\dfrac{0.1 \text{ mW}}{1} \times \dfrac{1000 \text{ kW}}{\text{mW}} \times \dfrac{8760 \text{ hours}}{\text{year}}$ = 876,000 kWh per year

= 73,000 kWh per month

Maximum revenue generated = $\dfrac{0.1 \text{ mW}}{1} \times \dfrac{1000 \text{ kW}}{\text{mW}} \times \dfrac{8760 \text{ hours}}{\text{year}} \times \dfrac{\$0.09}{\text{kWh}}$ = $78,840

Revenue at 75% energy production capacity = 75% $\times$ $78,840 = $59,130

Revenue at 50% energy production capacity = 50% $\times$ $78,840 = $39,420

|  | 100% | 75% | 50% |
|---|---|---|---|
| 10 Year Contract Total Revenues | $788,400 | $443,475 | $394,200 |

**Amortization Cost (20 years)**

Capital Cost = $\dfrac{1 \text{ units} \times \$300,000}{\text{unit}}$ = $300,000

Estimated Base electrical upgrades = $500,000

Cost of lithium ion battery backup = $\dfrac{\$5.00}{\text{watt}} \times \dfrac{1000 \text{ watts}}{\text{kW}} \times 100 \text{ kW}$ = $500,000

Cost to accommodate battery backup = $12,000 (structure) + $5,000 (electrical) + $3,500 (labor) = $20,500

Total for battery backup per 100 kW unit = $500,000 + $20,500 = $520,500

Amortization based on a 20 year period at a 5 percent annual interest rate.

Amortization period = n = 20 years = 240 months

Interest rate = I = 5 %/year = 0.00417 month

Interest factor = $(1+i)^n$ = $( 1 + 0.004 )^{240}$ = 2.713

Capital Cost = C = $800,000        w/Battery BU $1,320,500

Monthly payment = $C/(((1+i)^n - 1)/(i*(1+i)^n))$ = $8,715 /month = $104,577 per year

BECHTEL-S CORPORATION/Ellsworth Revised 23 June 2011.xlsx

771

# ELLSWORTH AFB
## ELECTRIC RATES FOR A SINGLE, 100kW WIND ENERGY UNIT

Monthly payment w/Battery BU =     $14,385 /month =     $172,617  per year

**Annual Maintenance**

Normal - Maintenance Labor at a composite salary rate =     $30.00  per hour
including benefits. Hours per month =173 hours + 18 hours of overtime at 1.5 time or 200 hours composite.
Assuming 10 units in close proximity operated by two operators.

Normal - Maintenance Labor Cost =     2 operators     $\dfrac{200 \text{ hours}}{\text{month}}$     $\dfrac{\$30.00}{\text{hour}}$ =

= $12,000.00  per month =     $144,000  per year

Normal - Maintenance Labor Cost per Unit =     $\dfrac{\$12,000.00}{\text{month}}$     $\dfrac{}{1 \text{ units}}$ =     $\dfrac{\$12,000.00 \text{ unit}}{\text{month}}$

Emergency Maintenance Labor - 6 staff - 10 days per year for maintenance on 10 units

| | Number of Staff | Labor Rate | Hours per Year | Annual Labor Cost | Average Monthly Labor Cost 1 Unit |
|---|---|---|---|---|---|
| EM Labor Category 1 | 4 | $26.00 | 320 | $8,320.00 | |
| EM Labor Category 2 | 4 | $30.00 | 320 | $9,600.00 | |
| EM Labor Category 3 | 1 | $35.00 | 80 | $2,800.00 | |
| EM Labor - Electrical | 1 | $50.00 | 80 | $3,500.00 | |

Emergency Maintenance Labor Total Cost =     $24,220.00     $2,018

Emergency Maintenance - Travel Costs

| | Number of Staff | Labor Rate | Hours per Year | Annual Travel Labor Cost | Average Monthly Travel Labor Cost 1 Unit |
|---|---|---|---|---|---|
| EM Travel - Labor Category 1 | 4 | $26.00 | 40 | $1,040.00 | |
| EM Travel - Labor Category 2 | 4 | $30.00 | 40 | $1,200.00 | |
| EM Travel - Labor Category 3 | 1 | $35.00 | 40 | $1,400.00 | |
| EM Travel - Labor - Electrician | 1 | $30.00 | | $0.00 | |

Emergency Maintenance Travel - Labor Total Cost =     $3,640.00     $303



12/10/2015

# ELLSWORTH AFB
## ELECTRIC RATES FOR A SINGLE, 100KW WIND ENERGY UNIT

| Item | Unit Cost | Unit | QTY | Cost | Average Monthly Travel Cost |
|---|---|---|---|---|---|
| Airfare: Austin - Rapids City (RT) | $415.00 | EA | 9 | $3,735.00 | |
| Lodging (annual avg for RC, SD) | $88.00 | Night | 90 | $7,920.00 | |
| Per Diem Meals,etc | $51.00 | day | 96 | $4,896.00 | |
| Lodging tax | $20.00 | Night | 90 | $1,800.00 | |
| Car Rental (incl. fuel) | $75.00 | day | 30 | $2,250.00 | |
| Subtotal Contractor Travel | | | | $20,601.00 | $1,717 |

Total Emergency Maintenance Cost = $2,018 + $303 = $1,717

$4,038    per month

Annual Maintenance Materials at 2% of capital = $1,320,500  $\times$  0.02 = $26,410  per year / 12 months

Calculated Monthly/Annual O&M Cost =

N-M Labor $12,000   $2,201 per month =

E-M Labor $2,201   +   Maint. Mat. $2,201   +

Amort. $8,715   $25,116 per month = $301,397

Calculated Monthly/Annual O&M Cost w/Battery BU = $30,786   per month = $369,437

Calculated Monthly O&M Cost as a percent of capital cost= $14,201 / $1,320,500 = 1.1%

Electric Rate calculated on a monthly basis at various percent of maximum production =

| Percent of Maximum Energy Production | Electric Rate (20 year amortization) $/kWh | Electric Rate (20 year amortization) + Battery BU $/kWh | Electric Rate (10 year amortization) $/kWh | Electric Rate (10 year amortization) + Battery BU $/kWh |
|---|---|---|---|---|
| 100 | $0.34 | $0.42 | $0.44 | $0.57 |
| 75 | $0.46 | $0.56 | $0.59 | $0.76 |
| 50 | $0.69 | $0.84 | $0.88 | $1.13 |



**Amortization Cost (10 years)**

Capital Cost =   1 units   $\dfrac{\$300,000}{\text{unit}}$ = $300,000

Estimated Base electrical upgrades = $500,000

Amortization based on a   10 year period at a   5 percent annual interest rate.

Amortization period = $n$ =   10 years =   120 months

Interest rate = $i$ =   5 %/year =   0.00417 month

Interest factor = $(1+i)^n$ =   ( 1 + 0.004 )$^{120}$ =   1.647

**Capital Cost = C =   $800,000**   **$1,320,500**

Monthly payment =   $C/(((1+i)^n-1)/(i*(1+i)^n))$ =   $14,006 /month =   **$168,071**  per year

Monthly payment w/Battery BU =   $23,119 /month =   **$277,423**  per year

| | Amortization | | Labor | | EM Maint. | | Maint. Materials | |
|---|---|---|---|---|---|---|---|---|
| Total monthly capital and O&M cost for 1, 100 kW units = | $14,006 | + | $12,000 | + | $4,038 | + | $2,201 | = |
| | = | $32,245 | | | | | | |
| Total monthly capital and o&M cost for 1, 100 kW units = | $23,119 | + | $12,000 | + | $4,038 | + | $2,201 | = |
| | = | $41,358 | | | | | | |



# SUPPORTING DOCUMENTATION FOR ESTCP PROPOSAL

## SUBMISSION

All CM Energies' Wind Energy Systems are designed to be deployed in metropolitan environments, and require no transmission line infrastructure development. CM Energies' Wind Energy Systems can be installed in two days with a complete project turn-around time of 6-8 weeks depending on funding and in stock parts. CM Energies' Wind Energy Systems are silent in operation, never exceed the power of the wind.



14th Generation System installed at CME plant.     Installed at municipal Waste Water Treatment Plant. Residential area in background



Easy Installation. No construction.

Each Wind Energy System is less than 50 feet tall and 40 feet wide at the sail, and designed to be incorporated into the existing transmission line system of any electric utility. The Systems can also be connected behind the meter. The System size is based on local utility line connectivity and load requirements. CM Energies' Wind Energy System's can be utilized in metropolitan, rural, agricultural, emergency management, and maritime applications. CM Energies' Wind Energy Systems are also designed to be installed on rooftops and can be adapted to vehicles for mobility or rapid deployment.



Can put up to 9 Systems on one acre.

CM Energies is now marketing its 15th generation System. CM Energies' proprietary composite blades are designed to withstand UV exposure, weather, impact and other elements that may affect the performance of the Wind Energy System. They are designed for low maintenance, long life and rapid replacement if necessary. These transparent blades are aesthetically pleasing and come in most any color in the hexachrome or pantone color chart making applications in and around residential areas more readily acceptable.



CM Energies is a registered Power Generation Company with the Texas Public Utility Commission and is managing both private and public wind energy contracts. CM Energies employs its own licensed engineers and electricians and performs its own installations, service, and maintenance. CM Energies also conducts its own Environmental Assessments and Studies. CM Energies has successfully completed Environmental Assessments with permitting approvals from the US Army Corps of Engineers, Texas Archeological Research Laboratory, US Fish and Wildlife, FAA and the Texas State Historic Preservation Office. These assessments were conducted for both coastal and inland projects with the inland projects covering lands surrounding aquifers, historic burial grounds, endangered and species of concern, bats, and other areas of concern.

MINUTES OF THE JONESTOWN CITY COUNCIL SPECIAL CALLED MEETING HELD MARCH 19, 2012, 9:00 A.M. AT THE CITY COUNCIL CHAMBERS 18649 FM 1431, SUITE 3-A, JONESTOWN, TEXAS

## A. ITEMS OPENING MEETING:

### 1. CALL TO ORDER                    MAYOR DEANE ARMSTRONG

Mayor Armstrong called the meeting to order at 9:00 a.m.

### 2. ROLL CALL                    ASSISTANT CITY SECRETARY

Upon roll call, the following members were present: Alderman Moore, Alderman Wedell, Alderman Nichols, Mayor Armstrong, Mayor Pro Tem Buckle and Alderman Aaron. A quorum was present.

### 3. PLEDGE OF ALLEGIANCE

## B. GENERAL BUSINESS AND ACTION ITEMS

1. Discuss and consider removal of Taylor location turbine system.

   Alderman Wedell recused himself from discussion and voting on this and item #2 left the dais.

   James Herrera, Public Works Director, discussed with Council, action that needs to be taken to remove the turbine system, and the cost of doing so. Mike Fox, president of PCRC, Inc. participated in the discussion. Alderman Nichols made a motion to enter into a contract with PCRC, Inc. for the removal of the Taylor wind turbine at a cost of $13,471, with the unit to be stored at property located at 3105 East Hwy 29 in Bertram, Texas, in a secure facility. Alderman Aaron seconded the motion. **Upon roll call the vote was as follows: Yes: Alderman Moore, Alderman Nichols, Mayor Pro Tem Buckle and Alderman Aaron. No: None. Abstain: None. The motion carried unanimously.**

2. Discuss and consider an ordinance amending the Ordinance No. 2011-O-412, the FY 2011/2012 City of Jonestown Budget.

   Alderman Nichols made a motion to amend the 2011/2012 City of Jonestown budget in the amount of $14,000 to cover the cost of the removal of the wind turbine, funds to be taken from the reserve fund. Mayor Pro Tem Buckle seconded the motion. **Upon roll call the vote was as follows: Yes: Alderman Moore, Alderman Nichols, Mayor Pro Tem Buckle and Alderman Aaron. No: None. Abstain: None. The motion carried unanimously.**

   **Mayor Armstrong took Items #4 and #5 out of order.**

4. Discuss and consider an ordinance amending Chapter 8 of the Code of Ordinances, Article 8.09 "Boats and party Boats; Restricted areas"; Prohibitions, Restricted Areas, and Setting Minimum Distance Requirements.

78

Alderman Wedell returned to the dais. City Administrator Dan Dodson presented this item and discussed the issue with Council and Police Chief Stetar. The current ban on party boats is probably not enforceable and the amendment will still enable the city to enforce the noise ordinance and have some control over the tying up of boats together, and on to property of land owners. Alderman Moore asked to have language added to make it clear that there needs to be separation between flotillas of boats that are tied together. Alderman Nichols made a motion to approve Ordinance No. 2012-O-423, an ordinance of the City of Jonestown, Texas amending Chapter 8 of the Jonestown, Texas Code of Ordinances, Article 8.09 "Boats and Party Boats; Restricted Areas"; providing for the regulation of boats by establishing prohibitions, restricted areas, and setting minimum distance requirements; establishing penalties per violation; providing for open meetings, savings, severability, and effective date clauses; and providing for related matters; with an addition to (3) "and consistent with State Law, groups of boats cannot block navigable waterways", to 8.09.002, General Prohibitions; Established Restricted Areas, and Distance Requirements. Mayor Pro Tem Buckle seconded the motion. **Upon roll call the vote was as follows: Yes: Alderman Moore, Alderman Wedell, Alderman Nichols, Mayor Pro Tem Buckle and Alderman Aaron. No: None. Abstain: None. The motion carried unanimously.**

5. Discuss and consider a Resolution authorizing the city to enter into an agreement with the Texas Department of Transportation (TXDOT) to enable the Police Department to be a participant in the state-wide CRASH Reporting and Analysis for Safer Highways (CRASH) System at no cost to the city.

Chief Stetar presented his request for the resolution. Mayor Pro Tem Buckle made a motion to approve Resolution NO. 2012-R-308. Alderman Nichols seconded the motion. **Upon roll call the vote was as follows: Yes: Alderman Aaron, Mayor Pro Tem Buckle, Alderman Nichols, Alderman Wedell and Alderman Moore. No: None. Abstain: None. The motion carried unanimously.**

3. a. Convene into executive session pursuant to Section 551.074, Tex. Gov't Code, to interview candidates and deliberate the appointment of a public officer or employee, for the position of City Administrator;

At 9:32 a.m. Mayor Armstrong announced that Council would adjourn into executive session on the above listed item. Council left the dais.

b. Reconvene into open session to take action as deemed appropriate in the City Council's discretion regarding appointment of a City Administrator.

Mayor Armstrong reconvened the open session at 11:12 a.m. Mayor Pro Tem Buckle made a motion that the top three candidates have background checks and to schedule a meeting for Monday, March 26, 2012 at 7:30 p.m. to discuss the finalists. Alderman Aaron seconded the motion. **Upon roll call the vote was as follows: Yes: Alderman Aaron, Mayor Pro Tem Buckle, Alderman Nichols, Alderman Wedell and Alderman Moore. No: None. Abstain: None. The motion carried unanimously.**

## 6. ADJOURNMENT

Mayor Armstrong adjourned the meeting at 11:20 a.m.

**PASSED AND APPROVED AT A REGULAR MEETING HELD ON APRIL 12ᵀᴴ , 2012.**

Deane Armstrong, Mayor
City of Jonestown

ATTEST:

Linda Hambrick, City Secretary

80

# MINUTES OF THE JONESTOWN CITY COUNCIL REGULAR MEETING HELD MARCH 8, 2012, 7:30 P.M. AT THE CITY COUNCIL CHAMBERS 18649 FM 1431, SUITE 3-A, JONESTOWN, TEXAS

## A. ITEMS OPENING MEETING:

### 1. CALL TO ORDER                    MAYOR DEANE ARMSTRONG

Mayor Armstrong called the meeting to order at 7:30 p.m.

### 2. ROLL CALL                        CITY SECRETARY

Upon roll call, the following members were present: Alderman Moore, Alderman Wedell, Alderman Nichols, Mayor Armstrong and Alderman Aaron. Mayor Pro Tem Buckle entered the meeting at 7:31 p.m. A quorum was present.

### 3. PLEDGE OF ALLEGIANCE

### 4. APPROVAL OF MINUTES
February 9, 2012 Regular Meeting
February 17, 2012 Special Called Meeting
March 5, 2012 Special Called Meeting

Alderman Moore asked for a correction in the February 9th minutes on page 4, item number 9 to add the word approve. Alderman Nichols made a motion to approve the minutes of the regular meeting of February 9th as amended by Councilman Moore, and the minutes of the special called meeting of February 17th, and the minutes of the special called meeting of March 5th. Alderman Wedell seconded the motion. **Upon roll call the vote was as follows: Yes: Alderman Moore, Alderman Wedell, Alderman Nichols, Mayor Pro Tem Buckle and Alderman Aaron. No: None. Abstain: None. The motion carried unanimously.**

## B. CITIZEN COMMUNICATIONS

Milton Allen asked that the applications of the final four applicants for the position of city administrator be posted on the city web site for citizen input.

## C. GENERAL BUSINESS AND ACTION ITEMS

1. Discuss and consider appointment of Police Reserve Officers.

   Police Chief John Stetar introduced John "Rick" Power, Randall Johnson, and Brandon Liles who all want to be Police Reserve Officers. Alderman Aaron made a motion to approve the appointments of John Rick Power, Randall Johnson and Brandon Liles. Alderman Moore seconded the motion. **Upon roll call the vote was as follows: Yes: Alderman Aaron, Mayor Pro Tem Buckle, Alderman Nichols, Alderman Wedell and Alderman Moore. No: None. Abstain: None. The motion carried unanimously.**

   Mayor Armstrong administered the oaths of office of office.

1

81

2. Discuss and consider waiving fees, overnight camping and any other pertinent park regulations for the March 31st Cajun Cook Off, sponsored by the Jonestown Lago Vista Area Chamber of Commerce.

   Alderman Aaron made a motion to waive fees, overnight camping and any other pertinent park regulations for the March 31st Cajun Cook Off, sponsored by the Jonestown Lago Vista Area Chamber of Commerce. Mayor Pro Tem Buckle seconded the motion. **Upon roll call the vote was as follows: Yes: Alderman Aaron, Mayor Pro Tem Buckle, Alderman Nichols, Alderman Wedell and Alderman Moore. No: None. Abstain: None. The motion carried unanimously.**

3. Discuss and consider approval of Lakeside Challenge 5k Run to be scheduled on September 29, 2012.

   Karissa Kornegay asked for approval of the date for the 5k run. She will come back to the next meeting with the budget for the event. Alderman Nichols made a motion to approve the Lakeside Challenge 5k Run to be scheduled on September 29, 2012. Alderman Wedell seconded the motion. **Upon roll call the vote was as follows: Yes: Alderman Moore, Alderman Wedell, Alderman Nichols, Mayor Pro Tem Buckle and Alderman Aaron. No: None. Abstain: None. The motion carried unanimously.**

4. Discuss and consider an ordinance of the City of Jonestown, Texas; amending Section 1.04.005(7) of Chapter 1, Jonestown Code of Ordinances, Authority of mayor generally; to change amounts and procedures for authorizing expenditures and contracts; providing open meetings; severability clauses; and establishing an effective date.

   Mayor Pro Tem Buckle made a motion to approve an ordinance of the City of Jonestown, Texas; amending Section 1.04.005(7) of Chapter 1, Jonestown Code of Ordinances, Authority of mayor generally; to change amounts and procedures for authorizing expenditures and contracts; providing open meetings; severability clauses; and establishing an effective date. Alderman Aaron seconded the motion for discussion. After discussion about contingencies in case of emergencies, the occasions that might be beneficial to make purchases within time constraints, and the tightening of budget item planning, the vote was taken. **Upon roll call the vote was as follows: Yes: Alderman Aaron, Mayor Pro Tem Buckle, Alderman Nichols, Alderman Wedell and Alderman Moore. No: None. Abstain: None. The motion carried unanimously.**

5. Discuss and consider an ordinance of the City of Jonestown, Texas; amending Article 12.01, General Provisions, of Chapter 12, Jonestown Code of Ordinances, to authorize the operation of golf carts on certain streets and roadways; amending Section 12.01.001, State motor vehicle laws adopted; providing penalty, severability, open meetings and effective date clauses; and providing for related matters.

   Alderman Nichols asked to add Old Burnet Road and Reed Parks Road to FM 1431 as excluded roads for the carts. Alderman Aaron expressed his wish to have a special license or conditional use permit for each cart user so that there isn't a proliferation of carts all over town. Mayor Pro Tem agreed and suggested adding Easy Street to the list of excluded streets. Alderman Aaron made a motion to table this item until it we can manage it with a conditional use permit. Alderman Nichols seconded the motion, and add the excluded roads.

2

During discussion, Alderman Moore expressed concern with the safety of carts on the streets, and a doubt that further consideration of this ordinance is worth the cost of developing the ordinance. **Upon roll call the vote was as follows: Yes: Alderman Aaron, Mayor Pro Tem Buckle, Alderman Nichols, Alderman Wedell and Alderman Moore. No: None. Abstain: None. The motion carried unanimously.**

6. Discuss and consider authorization to fund disassembly and removal of Taylor location turbine system.

   Mayor Armstrong asked City Administrator Dan Dodson to address this item. There was discussion about how best to dissemble and remove the turbine and the ownership of the machine. Mayor Pro Tem Buckle asked to postpone this discussion to a later meeting. An addendum will be posted to the March 12th meeting early in the morning to discuss this item. Mayor Pro Tem Buckle made a motion to table this item until the Monday meeting. Alderman Aaron seconded the motion. **Upon roll call the vote was as follows: Yes: Alderman Aaron, Mayor Pro Tem Buckle, Alderman Nichols, Alderman Wedell and Alderman Moore. No: None. Abstain: None. The motion carried unanimously.**

7. Discuss and consider the monthly finance report.

   The report was discussed. Mayor Pro Tem Buckle expressed surprise that there was a 97% tax collection in light of the situation at The Hollows. The police budget was discussed in some detail. No action was taken.

 8. Convene into executive session pursuant to Section 551.071, Tex. Gov't Code, and Section 1.05, Tex. Disciplinary Rules of Professional Conduct to consult with legal counsel regarding:
   a. Complaints filed by the Jonestown Action Committee
   b. Texas Comptroller of Public Accounts Grant RFA#RE-AG1-2010, Distributed Renewable Energy Grant Agreement and Related Investigation.

   Mayor Armstrong announced that Council would convene into executive session on the above items, and read the language. Council left the dais at 8:09 p.m.

   Reconvene into open session to take action as deemed appropriate in the City Council's discretion regarding:
   a. Complaints filed by the Jonestown Action Committee
   b. Texas Comptroller of Public Accounts Grant RFA#RE-AG1-2010, Distributed Renewable Energy Grant Agreement and Related Investigation.

   Mayor Armstrong reconvened the open session at 9:13 p.m. Alderman Nichols announced that Council reviewed the four page document prepared by the City Attorney to address the issues in the Jonestown Action Committee complaint, and that we had agreed to in our February 17th meeting to be presented for our discussion, council reviewed and asked for several small corrections to be made by the first of next week, and by next Wednesday the document will be posted on the city web site and copies will be sent to the Texas Attorney General's office, the Travis County District Attorney's office, the Department of Energy, the Texas Comptroller's Department, the Statesman and Jonestown Action Committee.

Mayor Pro Tem Buckle made a motion to provide the letter as amended and as presented. Alderman Aaron seconded the motion. **Upon roll call the vote was as follows: Yes: Alderman Aaron, Mayor Pro Tem Buckle, Alderman Nichols, Alderman Wedell and Alderman Moore. No: None. Abstain: None. The motion carried unanimously.**

Mayor Pro Tem Buckle asked that the record reflect that Mayor Armstrong, Alderman Wedell and Dan Dodson did not participate in the discussion with the city attorney regarding the letter.

## D. ADJOURNMENT

Mayor Armstrong adjourned the meeting at 9:35 p.m.

**PASSED AND APPROVED AT A REGULAR MEETING HELD ON APRIL 12, 2012.**

Deane Armstrong, Mayor
City of Jonestown


**ATTEST:**

Linda Hambrick, City Secretary

4

# SWORN AFFIDAVIT

I, **Howard Victor Reed, Jr.**, under the penalty of perjury, voluntarily make the following statements based on personal knowledge and experiences:

I met Charles Malouff ( Charlie ) in 1998 or 1999 in Austin, Texas while he was working as a Uniformed Police Officer for Sunset Valley, Texas. We were introduced through a mutual acquaintance who thought that I might be able to help Charlie sell some transparent bullet proof shields in Mexico and elsewhere in Latin America. I did take some samples of these shields to Costa Rica and Mexico, but was unable to produce any orders for the product.

Charlie and I became friends and we met every couple of months for lunch somewhere and on occasions my wife and I had him and a friend ( Joann ) over for dinner.

Sometime around 2006 or 2007 Charlie and I began talking about wind energy and we discussed finding a ranch in West Texas that we could buy. The idea being that the property would have appropriate terrain and be close enough to transmission lines that we could lease locations for wind turbines. At the same time we could run cattle on the ranch as well as a hunting operation. Both of which I do in Mexico at ranches owned by my family. It soon became apparent that we were not the first to come up with this idea and that wind companies had already tied up most, if not all, locations like the ones we were seeking. I only mention this because it was the first time we discussed getting involved in a wind energy project.

One day in 2008 Charlie called me and asked me to drive out from my home in Central Austin to Cedar Park, Texas (30 minutes) to look at a "contraption" which he thought I would find interesting. I drove to the address he gave me with my two elementary school boys and we parked my truck and followed him into the yard. There I saw a vertical axis "wind mill like device" whose blades could best be described as elongated double helix. The apparatus was spinning quite quickly in a low velocity wind.

Over the next many months I spoke about once a week to Charlie and we met about once a month to share a meal and discuss his plans to form a company and produce a commercially viable vertical shaft wind turbine.

At this time it makes sense to explain why Charlie would want to consult with me as to how to go about forming the company and financing the project. I have a BBA in International Business with Honors ( 1977 ), a Law Degree ( JD-1980 ) and an Masters of Business Administration ( 1984 ). I received them all from the University of Texas at Austin and have worked over a dozen projects as well as for Venture Capital Firms and a high profile bank. I have a good deal of experience in start up companies.

Somewhere around the year 2007 Charlie began traveling with me regularly to Mexico to one of my family ranches. We always drove there from Austin in my 1997 Green F-250 Diesel 4 wheel drive truck. We crossed the border at Eagle Pass, Texas and driving the remaining two and a half hours to the ranch. I was glad to have the company as this area of northern Mexico near the Texas border has security issues. Charlie traveled with me to the ranch on about 15 occasions and spent much of his time photographing wildlife, cattle and the cowboys at work.

My father had a major heart attack in late 2007 and was released from the hospital in early January 2008. Charlie visited him in the hospital and brought him a large potted plant. My father was released

85

to hospice care and given a month to live. He lived for another three years at home with my mother. At this time Charlie was working with the University of Texas at the Jake Pickle facility on Burnet Road where I visited him on many occasions. One time probably in early 2009 he called me and asked me to pull a front end loader with the experimental wind turbine attached out of the mud. I was visiting my father at the time and he asked me to take him with me. I helped my father into my F-250 and we drove to the Burnet Road location and pulled them out of the mud with my truck.

The original wind turbine design that Charlie took to the University of Texas would not work and my understanding from several meetings with University of Texas staff and graduate students is that a new design that they produced and were testing was considered by them as workable. I saw an orange colored device that was working and producing power. I recall that during the year or so that the wind turbine project the project went from a small model to a full sized wind turbine that was tested in the large wind tunnel at the facility. When Charlie left the University of Texas facility it was my understanding from my discussions with the graduate students as well as Professor Stearman that the turbine was ready for production. It was at this time that Charlie and I had a major disagreement as to how to proceed with his project. I was insistent that he sell a major, if not controlling, block of the company (CM Energies) to capitalize the company and begin construction of the turbines for sale to end users. He was convinced that the company could succeed with very little capitalization (mostly sweat equity) and successfully get awarded grant money. He had knowledge of grant funding as he had used it before in his bullet proof shield company.

Charlie went with me to the ranch several times while he was in the process of writing the grants seeking funding to build and sell the wind turbines. I clearly recall him spending hours at the ranch's dinner table working on the grant application. On many occasions he asked me to assist him in the proper wording to convey his intent. We spent many hours discussing the Jonestown Project during these 14 hour round trip drives to the ranch as well as during our stays at the ranch.

In January of 2011 Charlie and I flew to Phoenix, Arizona to pick up a Ford F-150 that I had been using for a real estate project in Sonora, Mexico 200 miles from there. We drove to the project that afternoon and then drove back to Tucson the next day. A plane belonging to a partner of the owners of the facility The Big Industrial Group ) that Charlie was assembling the turbines in in Taylor picked us up in his plane and flew us to Guaymas, Mexico. Near there we checked out a site that they were interested in putting wind turbines on. The next day we flew back to Tucson on their plane and drove back to Austin. That first day we got as far as Van Horn, Texas where we spent the night in a motel. I say this because for hours on the drive that afternoon and evening from Tucson, Charlie was next to me having conversations with his daughter about the project. Charlie was furious about some time sheets that one of his employees named Toby was trying to falsify. Sometime early that summer of 2011 Charlie called me to tell me that his tire had been slashed. We both suspected Toby.

The owners' of the facility that CM Energies was working out of were going to invest in CM Energies, but they wanted CM Energies to purchase the property it was using just a small portion of with a one million dollar down payment and a hugely inflated cost. They ( Big Industrial ) were also considering investing cash into the project and I attended the meeting with the principals and Charlie at the facility. The potential investors brought a man of about 70 years old names Vaughn Nelson with them as a technical advisor to evaluate the project. Mr. Vaughn was of the opinion that no vertical shaft wind turbine could ever work and quoted the wind power book he wrote and referred repeatedly to a failed vertical shaft

wind turbine that he had seen decades ago that had not worked. He made it clear he had no experience with vertical shaft wind turbines. That group despite assurances that they would proceed decided to back off the project.

In the summer of 2011, Charlie and I began conversations with some of the faculty of Texas State University about putting a wind turbine at their Freeman Ranch Property. I have sat on the Advisory Board of the Business School at Texas State University since 2006. Professor William "Bill" Stapleton attended these meetings. Bill was a Professor of Electrical Engineering at the University. I also saw Bill at CM Energies' production site working on the generator.

Most of the doubt I had as to Charlie's ability to complete this project successfully was dispelled after I visited the machine shop facility in Taylor, Texas (BABECO). The remainder of this doubt was dispelled after Charlie has his wind turbine up and running at his Taylor facility. At that time, I brought a highly respected electrical engineer from Tampico, Mexico named Policarpio Gorordo to Taylor to inspect the turbine and give me his opinion as to its performance. Policarpio was impressed and told me that he would help me sell the product in Mexico. I had a Mexican company formed and named it CM Energies de Mexico and set out to present the product to several potential buyers along with some associates. I would have proceeded more quickly. However, Mexico's laws were in the process of changing to allow not only for an entity to produce its own electricity, but allowing it to sell to third parties. Mexico's rate structure of the CFE ( Federal Power Commission ) is three times the average electrical rate in Texas. The opportunity was huge in Mexico and the laws were changed around this time to allow private entities to sell electricity to commercial and industrial customers.

In 2010, Charlie quit going to the ranch with me because he no longer had time to spare as he was spending all his time and effort on his company. He approached me in mid-2011 and asked me to help him raise some equity for his company as he realized that he might run short of funding to complete all the wind turbines for Jonestown. I told Charlie that I thought I could raise the money, but that it would cost him control of the company. He said he would agree to that as long as it completed the Jonestown Project. Another solution was to get purchase orders from other buyers and use the profits from these sales to continue to fund the Jonestown Project. He agreed and I began making phone calls to some potential investors. Charlie was lining up other investors at this time as well. I was near securing a purchase order for four turbines as well as an equity injection when I received a call from Charlie telling me that he had been arrested and was in the Travis County Jail. I told my potential clients and investors that we were putting the project on hold indefinitely and still hear from them from time to time asking me when I will start it up again.

A few months later I was asked by the prosecutor's office if I would come in and talk to them about the case. I glad to and met with them a couple of days later. I told Lori Carter and the head prosecutor pretty much what I am writing down now. I told them that the wind turbine was working and that I had had a Mexican friend of mine who was the electrical engineer come up to check out the system before we offered it for sale in Mexico. As far as I was concerned the system was ready to go and I considered it commercially available and that that was why I was getting purchase orders for delivery of the turbines into Mexico.

During the trial Tamara (one of Charlie's defense counsels) called me and asked me to testify as a rebuttal witness to a statement that Lori Carter had made under oath at the trial stating that the main reason that they moved so quickly to arrest Charlie (not allowing him to finish the project) was the risk of

him "fleeing to Mexico in Howard Reed's plane". I have never owned a plane and the last plane my family owned was over 30 years ago. I have never taken Charlie to the ranch in Mexico in a plane and I have lived in Austin at the same address with my wife and two children for over twenty years. I would never have assisted Charlie in an attempt to flee. Charlie was always committed to stay and clear his name. We never even had a discussion about any avoidance of his going to trial. My name appears on his arrest warrant as being a wealthy friend of Charlie's with Mexico connections that might assist Charlie in an attempt to flee prosecution. This was ridiculous.

Not only have I known Charlie for over 15 years, but I was a close friend and consultant throughout the time he started CM Energies, designed and built the first wind turbines, helped Jonestown secure the grant, began his relationship with BABECO and was building and delivering working wind turbines to Jonestown. I met the mayor of Jonestown on several occasions and spent time with Prof. Bill Stapleton.

It is my firm and steadfast opinion that the only reason Charlie did not complete the Jonestown project was that he was arrested prior to finishing the project. With almost 3 months left to complete this contract and Charlie's determination to successfully complete it, it is my opinion that he would have completed it, but for the arrest. There was never any intent to defraud anyone, just unforeseen adverse cost increases and an overzealous prosecution that prevented him from having the time to recapitalize and finish the project.

I attest these statements are true and correct to the best of my knowledge.

_Howard V. Reed_

Howard Victor Reed, Jr.

Comes now Howard V. Reed, who has Sworn and subscribed to this Affidavit before me on this 9th day of June, 2014

_Jamie W. Hutto_

Notary Public

JAMIE W HUTTO
Notary Public
STATE OF TEXAS
My Comm. Exp. April 4, 2016

MY COMMISSION EXPIRES 4/4/16

## §2151. Definitions

As used in this chapter:

The words "war material" include arms, armament, ammunition, livestock, forage, forest products and standing timber, stores of clothing, air, water, food, foodstuffs, fuel, supplies, munitions, and all articles, parts or ingredients, intended for, adapted to, or suitable for the use of the United States or any associate nation, in connection with the conduct of war or defense activities.

The words "war premises" include all buildings, grounds, mines, or other places wherein such war material is being produced, manufactured, repaired, stored, mined, extracted, distributed, loaded, unloaded, or transported, together with all machinery and appliances therein contained; and all forts, arsenals, navy yards, camps, prisons, or other installations of the Armed Forces of the United States, or any associate nation.

The words "war utilities" include all railroads, railways, electric lines, roads of whatever description, any railroad or railway fixture, canal, lock, dam, wharf, pier, dock, bridge, building, structure, engine, machine, mechanical contrivance, car, vehicle, boat, aircraft, airfields, air lanes, and fixtures or appurtenances thereof, or any other means of transportation whatsoever, whereon or whereby such war material or any troops of the United States, or of any associate nation, are being or may be transported either within the limits of the United States or upon the high seas or elsewhere; and all air-conditioning systems, dams, reservoirs, aqueducts, water and gas mains and pipes, structures and buildings, whereby or in connection with which air, water or gas is being furnished, or may be furnished, to any war premises or to the Armed Forces of the United States, or any associate nation, and all electric light and power, steam or pneumatic power, telephone and telegraph plants, poles, wires, and fixtures, and wireless stations, and the buildings connected with the maintenance and operation thereof used to supply air, water, light, heat, power, or facilities of communication to any war premises or to the Armed Forces of the United States, or any associate nation.

The words "associate nation" mean any nation at war with any nation with which the United States is at war.

The words "national-defense material" include arms, armament, ammunition, livestock, forage, forest products and standing timber, stores of clothing, air, water, food, foodstuffs, fuel, supplies, munitions, and all other articles of whatever description and any part or ingredient thereof, intended for, adapted to, or suitable for the use of the United States in connection with the national defense or for use in or in connection with the producing, manufacturing, repairing, storing, mining, extracting, distributing, loading, unloading, or transporting of any of the materials or other articles hereinbefore mentioned or any part or ingredient thereof.

The words "national-defense premises" include all buildings, grounds, mines, or other places wherein such national-defense material is being produced, manufactured, repaired, stored, mined, extracted, distributed, loaded, unloaded, or transported, together with all machinery and appliances therein contained; and all forts, arsenals, navy yards, camps, prisons, or other installations of the Armed Forces of the United States.

The words "national-defense utilities" include all railroads, railways, electric lines, roads of whatever description, railroad or railway fixture, canal, lock, dam, wharf, pier, dock, bridge, building, structure, engine, machine, mechanical contrivance, car, vehicle, boat, aircraft, airfields, air lanes, and fixtures or appurtenances thereof, or any other means of transportion whatsoever, whereon or whereby such national-defense material, or any troops of the United

States, are being or may be transported either within the limits of the United States or upon the high seas or elsewhere; and all air-conditioning systems, dams, reservoirs, aqueducts, water and gas mains and pipes, structures, and buildings, whereby or in connection with which air, water, or gas may be furnished to any national-defense premises or to the Armed Forces of the United States, and all electric light and power, steam or pneumatic power, telephone and telegraph plants, poles, wires, and fixtures and wireless stations, and the buildings connected with the maintenance and operation thereof used to supply air, water, light, heat, power, or facilities of communication to any national-defense premises or to the Armed Forces of the United States.

**18 USC 2153: Destruction of war material, war premises, or war utilities** Text contains those laws in effect on December 8, 2015
**From Title 18-CRIMES AND CRIMINAL PROCEDUREPART I-CRIMESCHAPTER 105-SABOTAGE**
**Jump To:** Source CreditAmendments

## §2153. Destruction of war material, war premises, or war utilities

(a) Whoever, when the United States is at war, or in times of national emergency as declared by the President or by the Congress, with intent to injure, interfere with, or obstruct the United States or any associate nation in preparing for or carrying on the war or defense activities, or, with reason to believe that his act may injure, interfere with, or obstruct the United States or any associate nation in preparing for or carrying on the war or defense activities, willfully injures, destroys, contaminates or infects, or attempts to so injure, destroy, contaminate or infect any war material, war premises, or war utilities, shall be fined under this title or imprisoned not more than thirty years, or both.

(b) If two or more persons conspire to violate this section, and one or more of such persons do any act to effect the object of the conspiracy, each of the parties to such conspiracy shall be punished as provided in subsection (a) of this section.

**18 USC 2155: Destruction of national-defense materials, national-defense premises, or national-defense utilities** Text contains those laws in effect on December 8, 2015
**From Title 18-CRIMES AND CRIMINAL PROCEDUREPART I-CRIMESCHAPTER 105-SABOTAGE**
**Jump To:** Source CreditAmendments

## §2155. Destruction of national-defense materials, national-defense premises, or national-defense utilities

(a) Whoever, with intent to injure, interfere with, or obstruct the national defense of the United States, willfully injures, destroys, contaminates or infects, or attempts to so injure, destroy, contaminate or infect any national-defense material, national-defense premises, or national-defense utilities, shall be fined under this title or imprisoned not more than 20 years, or both, and, if death results to any person, shall be imprisoned for any term of years or for life.

(b) If two or more persons conspire to violate this section, and one or more of such persons do any act to effect the object of the conspiracy, each of the parties to such conspiracy shall be punished as provided in subsection (a) of this section.

98

## §241. Conspiracy against rights

If two or more persons conspire to injure, oppress, threaten, or intimidate any person in any State, Territory, Commonwealth, Possession, or District in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same; or

If two or more persons go in disguise on the highway, or on the premises of another, with intent to prevent or hinder his free exercise or enjoyment of any right or privilege so secured-

They shall be fined under this title or imprisoned not more than ten years, or both; and if death results from the acts committed in violation of this section or if such acts include kidnapping or an attempt to kidnap, aggravated sexual abuse or an attempt to commit aggravated sexual abuse, or an attempt to kill, they shall be fined under this title or imprisoned for any term of years or for life, or both, or may be sentenced to death.